David W. Criswell, OSB# 92593
dcriswell@balljanik.com
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, OR 97204
Telephone: (503) 228-2525
Facsimile: (503) 226-3910
Of Attorneys for Amy Mitchell,
Chapter 7 Trustee

CLERK US BANKRUPTCY COURT
DISTRICT OF OREGON

'06 JUL 18 P3 53

LODGED_____REC'D____
PAID_____DOCKETED.____

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

In re

**GKPS, Inc.,**

    Debtor.

Case No. 04-34670-tmb**7**

**AFFIDAVIT OF MATTHEW A. GOLDBERG IN SUPPORT OF TRUSTEE'S MOTION FOR SUBSTANTIVE CONSOLIDATION UNDER § 105(a)**

    I, MATTHEW A. GOLDBERG. Being first duly sworn, do depose and say:

    1.    I am an attorney at Preston, Gates & Ellis, LLP, and am representing the Trustee in the Symphony Healthcare V, LLC proceeding, case no. 04-32593.

    2.    I make this affidavit on the basis of personal knowledge and am competent to testify to the matters asserted herein.

    3.    I make this affidavit in support of Trustee's Motion for Substantive Consolidation Under § 105(a).

    4.    I certify that the following exhibits are true and accurate copies of the originals:



    a.    <u>Exhibit A</u>: Excerpt from Transcript of Examination of Kenneth W. Perry Pursuant to Fed. R. Bankr. P. 2004 (dated May 17, 2005) ("Perry 2004 Exam Part I");

    b.    <u>Exhibit B</u>: Excerpt from Transcript of Continued Examination of Kenneth W. Perry Pursuant to Fed. R. Bankr. P. 2004 (dated June 2, 2005) ("Perry 2004 Exam Part II");

**Page 1 - AF FIDAVIT OF MATTHEW A. GOLDBERG**

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone 503-228-2525

531722

     c.    <u>Exhibit C</u>: Excerpt from Transcript of Examination of Sudhir P. Srivastava Pursuant to Fed. R. Bankr. P. 2004 (dated May 17, 2005) ("Srivastava 2004 Exam");

     d.    <u>Exhibit D</u>: Excerpt from Transcript of Examination of Suresh N. Gadasalli Pursuant to Fed. R. Bankr. P. 2004 (dated May 17, 2005) ("Gadasalli 2004 Exam");

     e.    <u>Exhibit E</u>: Promissory Note between Hospital and Surgical Center Management Services, L.P. and Western National Bank (dated February 1, 2002) ("Loan Agreement");

     f.    <u>Exhibit F</u>: Answer to Question 3(b) on Statement of Financial Affairs from Symphony V's voluntary Chapter 11 bankruptcy case (dated May 10, 2004) ("SoFA");

     g.    <u>Exhibit G</u>: Excerpt from Transcript of Continued § 341(a) Meeting of Creditors of GKPS and Symphony V (as consolidated) (dated June 22, 2004) ("§ 341(a)");

     h.    <u>Exhibit H</u>: Payoff Letter for from Western National Bank to Roberta A. Kale (dated December 15, 2004) ("Payoff Letter");

     i.    <u>Exhibit I</u>: Western National Bank Debit Records for Account No. 22403939 (dated April 23, 2003 and April 30, 2003) ("Debit Slips");

     j.    <u>Exhibit J</u>: Western National Bank Statement for April 2003 for Account No. 22403949 ("Statement").

DATED this 18 day of July, 2006.



    Matthew A. Goldberg, OSB #05265

STATE OF OREGON    )
                   ) ss
County of Multnomah  )

SUBSCRIBED AND SWORN to before me this 18th day of July, 2006.

OFFICIAL SEAL
JANET Z SHELTON
NOTARY PUBLIC-OREGON
COMMISSION NO. A373642
MY COMMISSION EXPIRES DECEMBER 20, 2007

Janet Z Shelton
NOTARY PUBLIC FOR OREGON
My Commission Expires: 12-20-07

**Page 2 - AFFIDAVIT OF MATTHEW A. GOLDBERG**

531722

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF OREGON

IN RE:                          )
                                )
GKPS, INC., et al.,             ) CASE NO. 04-34670-tmb11
                                ) (Jointly Administered)
    Debtors in Possession       )

------------------------------------------------

THE 2004 EXAMINATION OF:
KENNETH W. PERRY
May 17, 2005

VIDEO CONFERENCE

------------------------------------------------

I N D E X

DIRECT EXAMINATION BY MR. FIELD..........Page   3



------------------------------------------------
------------------------------------------------
LISA C. HOBBS
Court Reporter
615 Truxton Drive
Nashville, Tennessee  37214
Phone:  (615) 902-0288

---

The 2004 Examination of Kenneth W. Perry,
taken pursuant to agreement at U.S. Trustee's
Office, 701 Broadway, Nashville, Tennessee,
beginning at 11:00 a.m., at the instance of
counsel for the Committee of Unsecured Creditors,
pursuant to the provisions of the Federal Rules of
Bankruptcy Procedure.

    All formalities as to notice, caption,
and reading and signing of the deposition by the
witness are waived.  All objections except as to
form of the question are reserved for the hearing.
------------------------------------------------
A P P E A R A N C E S
FOR MR. PERRY:

        MR. RANDAL S. MASHBURN
        Attorney at Law
        Baker, Donelson, Bearman,
        Caldwell & Berkowitz, PC
        Commerce Center, Suite 1000
        211 Commerce Street
        Nashville, Tennessee  37201

ALSO PRESENT: MR. CRAIG GABBERT

VIA VIDEO CONFERENCE:
FOR THE COMMITTEE OF UNSECURED CREDITORS:

        MR. JOSEPH A. FIELD
        Attorney At Law
        Field & Associates
        610 S.W. Alder
        Suite 910
        Portland, Oregon  97205

ALSO PRESENT:

        MS. VIVIAN POPPERL
        MR. ALLEN PAINTER
        MR. TIM CONWAY

EXHIBIT  A
Page 1 of 6

---

Page 3

1        KENNETH W. PERRY,
2  having been first duly sworn, was examined and
3  deposed as follows:
4
5  DIRECT EXAMINATION BY MR. FIELD:
6      Q.  Can you state your name for the
7  record?
8      A.  Kenneth Wayne Perry.
9      Q.  Okay. Mr. Perry, do you know why
10 you're here today?
11     A.  Yes, I believe I do.
12     Q.  Can you tell us in your own words
13 why you're here today?
14     A.  To testify on behalf of the
15 bankruptcy, Chapter 11 filed, and answer questions
16 to the best of my ability.
17     Q.  Okay. And you understand you're
18 here on your own behalf and you're also here on
19 behalf of Hospital and Surgical Center Management
20 Services?
21     A.  Yes.
22     Q.  Okay. Have you ever been in a
23 deposition or a 2004 examination before?
24     A.  I've been in a deposition before.
25 I don't know what a 2004 examination, I don't know

Page 4

1  what that is.
2      Q.  Okay. You understand today that
3  we're conducting this 2004 bankruptcy examination
4  by video conference; correct?
5      A.  Yes.
6      Q.  And you're with your attorney,
7  Randal Mashburn, at the United States Trustee's
8  Office in Nashville, Tennessee; correct?
9      A.  Yes. And we are at the U.S.
10 Trustee's Office here in Portland, Oregon. And
11 because we're doing this over the telephone, I ask
12 that if at any time if we lose transmission and
13 you can't hear us, but you can still see us, that
14 you wave your hand at us so we'll know; okay?
15     A.  Will do.
16     Q.  All right. And if you lose the
17 picture, just tell us, otherwise we will call you
18 back. Fair enough?
19     A.  Okay.
20     Q.  When were you in a deposition
21 before today?
22     A.  Oh, probably, I think it would have
23 been -- well, no, it had been probably like 1997,
24 '98 with Columbia HCA.
25     Q.  I see. And what were the

1    curious as to why you furnished me with those
2    documents.
3        A.  Well, let me look.  Well, I did
4    some consulting for Alliance Hospital.
5        Q.  When was that?
6        A.  Early on before they even developed
7    the hospital.
8        Q.  When would that have been?
9        A.  Probably, 2001.
10        Q.  And how long did that go on?
11        A.  I don't know, a few months.  I
12    helped do their financial projections, and some
13    things like that.
14        Q.  And when was the last time you
15    consulted for Alliance Hospital?
16        A.  Probably -- I don't think I did
17    anything in 2002 other than, you know, Bulldog IT
18    did have a contract with Alliance Hospital.
19        Q.  Anything else?
20        A.  Not that I'm aware of.
21        Q.  And so were Drs. Srivastava and
22    Gadsalli directors at Bulldog IT?
23        A.  Yes.
24        Q.  And they were the directors at
25    Alliance Hospital?

1        A.  I believe so.
2        Q.  Okay.  So I'm going to switch
3    topics back to the formation of GKPS.  So Bobbie
4    Kale introduced you to Drs. Srivastava and
5    Gadsalli?
6        A.  Yes.
7        Q.  When would that have been?
8        A.  I think I met them first when I was
9    doing the consulting for Alliance.
10        Q.  In 2001?
11        A.  Right.
12        Q.  And when did you first discuss
13    purchasing hospitals in Oregon with them?
14        A.  I believe it would have been late
15    2001 probably.  I think that's when GKPS was
16    formed.
17        Q.  And whose idea was it to form GKPS?
18        A.  Well, I don't know.  I guess it was
19    Bobbie and I, the doctors, you know.
20        Q.  And Dan Holman was the attorney
21    that formed GKPS?
22        A.  I believe so.
23        Q.  Do you know in which state you
24    formed GKPS?
25        A.  Nevada, I believe.

1        Q.  Do you know why you chose Nevada to
2    form GKPS?
3        A.  Because my attorney recommended it.
4        Q.  Did you have any idea how it
5    benefitted you to be in Nevada?
6        A.  I think there were lower taxes, or
7    something like that.
8        Q.  Have you ever been to Nevada?
9        A.  Yes.
10        Q.  Did you physically go to start
11    GKPS?
12        A.  No.
13        Q.  And did you start any other
14    entities in addition to GKPS to purchase the
15    hospitals in Oregon?
16        A.  Yeah.  We actually had an entity
17    called HSC, which was, you know, got formed, but
18    it really never got used.
19        Q.  Whose idea was it to form HSC?
20        A.  Dan Holman's.
21        Q.  And do you have any idea why you
22    formed HSC?
23        A.  Well, I don't remember exactly
24    other than we needed a limited liability company.
25    And then the other one was an S-Corp, and there

1    was some reason for that but I couldn't tell you
2    why.
3        Q.  When you say the other one was an
4    S-Corp, what is the one you're referring to?
5        A.  The LLC, I think it was just a
6    partnership.
7        Q.  Okay.  I'm a little bit confused.
8    So GKPS --
9        A.  Right.
10        Q.  -- was a C-Corporation?
11        A.  S-Corporation.
12        Q.  HSC, you said that was a Nevada,
13    LLC?
14        A.  No, I did not.
15        Q.  What was it?
16        A.  You know, I can't tell you right
17    now.  Actually, I don't remember.  But I don't
18    think it was out of Nevada.
19        Q.  Okay.  Do you know where it was?
20        A.  No.  I really don't without looking
21    at the documents.
22        Q.  Okay.  You said that you described
23    another entity.  What was that other entity?
24        A.  I just said GKPS and HSC.  That's
25    it.

1    Q. Were you aware of more than one HSC
2 entity?
3    A. No.
4    Q. Do you have any recollection of an
5 HSC entity in Tennessee?
6    A. Well, that could be the HSC we're
7 talking about. I don't know what state it's out
8 of.
9    Q. Do you know if HSC ever filed a tax
10 return?
11    A. One.
12    Q. What year?
13    A. I believe 2002.
14    Q. Do you know who the accountant was
15 on that?
16    A. Bill Elms.
17    Q. Out of Odessa, Texas?
18    A. Yes.
19    Q. And do you have a copy of that tax
20 return?
21    A. I don't know if I do or not. I
22 know I can probably get it.
23    Q. Would you get that for me?
24    A. Will do.
25    Q. Okay. And do you know, did you

1 personally get a K1 from HSC in 2002?
2    A. I believe so.
3    Q. And do you know what the activity
4 reported was?
5    A. It was just some expenses that got
6 paid out of there. I believe that's all it was.
7    Q. And where did the money come from
8 to pay those expenses?
9    A. Initially, we had all written some
10 small checks of about I think $1,000 each or
11 something into there, and that got used for some
12 of the initial start-up expenses.
13    Q. And did HSC ever have any activity
14 of which you're aware?
15    A. Not really other than when we
16 started up, that was it.
17    Q. So when you say when we started up,
18 that was it, can you explain what you mean?
19    A. Well, those accounts were closed
20 pretty quickly, and once we did the transaction
21 for Symphony, everything went through GKPS.
22    Q. Now, when you say those accounts
23 were closed up pretty quickly, which accounts is
24 it that you're referring to?
25    A. Just the one account that was in

1 Nashville with AmSouth.
2    Q. And that's the account that would
3 have had a maximum of $4,000 because each of the
4 four GKPS investors put $1,000 each into it?
5    A. Yeah. There might have been some
6 consulting monies that went in through there
7 early, but it wasn't much.
8    Q. And who would have been doing that
9 consulting?
10    A. I would have.
11    Q. And who was your client for whom
12 you were consulting?
13    A. Oh, I don't remember. But it just
14 seems like there was a little bit of other money
15 that went through that. But I haven't looked at
16 those bank statements in two years, so.
17    Q. Now, you said a little bit of other
18 money. Can you give me a range?
19    A. I have no idea. But I know it
20 wasn't more than probably $20,000 or something
21 like that.
22    Q. When you say HSC, that's Hospital
23 and Surgical Center Management Services; correct?
24    A. Yes.
25    Q. Did it ever have an office?

1    A. No. Really, there's only been one
2 Symphony office, and it was all together. I mean
3 there wasn't any separation.
4    Q. And did HSC ever have employees?
5    A. Not that I'm aware of.
6    Q. And so to the best of your
7 recollection, HSC was a company that you started
8 to put a little money into like $1,000 each, and
9 you might have put up to $20,000 of consulting
10 revenue into HSC. HSC filed a tax return in 2002.
11 Then what became of HSC after that?
12    A. It ceased to be used.
13    Q. And was it ever wound up?
14    A. You know, I don't know,
15 technically, if the corporation or LLC was
16 terminated or not. We just stopped using it.
17    Q. And do you know what would have
18 happened to the $20,000 or so that went through
19 its bank account?
20    A. Yeah. They were for expenses when
21 we were trying to buy hospitals before there was
22 any business. It would have gone to pay, you
23 know, just whatever expenses, I imagine.
24    Q. And what other hospitals did you
25 try to purchase through GKPS or HSC in addition to

1  the hospitals in Portland, Oregon?
2     A.  We talked with HCA about buying
3  some hospitals.  Back when we started, they had
4  three or four hospitals for sale.  I think Tenant
5  (phonetic) had a couple of hospitals for sale at
6  the time.  So we looked for some other things, but
7  never bought anything.
8     Q.  Okay.  And did you ever receive a
9  salary from GKPS?
10    A.  Yes.
11    Q.  When did that commence?
12    A.  I believe -- it would have been
13 after we started, you know, once we completed the
14 Healthmont transaction, which would have been
15 March of 2002.
16    Q.  And was that the first time you
17 were ever paid from GKPS?
18    A.  To the best of my recollection.
19    Q.  And how often had you met with
20 Roberta Kale and Drs. Gadsalli and Srivastava
21 prior to March of 2002 on GKPS business?
22    A.  I don't know, I talked with Bobbie
23 Kale quite frequently, so more on the phone than
24 actual visiting.  And was she also looking for
25    Q.  And was she also looking for

1  investments for GKPS?
2     A.  She may have been.  I don't
3  remember.
4     Q.  And how much money did each of the
5  investors initially put up into GKPS?
6     A.  Well, we basically signed a note
7  with Western National Bank for a million dollars
8  that went into GKPS, along with the monies from
9  Healthcare Business Credit to do the initial
10 Healthmont transaction.
11    Q.  Okay.  That was for your March 2002
12 purchase of the two hospitals in Oregon; correct?
13    A.  Yes.
14    Q.  But you stated that you formed
15 GKPS, I believe, in November of 2002; is that
16 correct?
17    A.  Right.
18    Q.  And so when you formed GKPS, how
19 much money did the investors contribute to GKPS?
20    A.  It was a minimal amount to get the
21 entity started.  I mean I don't know what it was.
22    Q.  When you say a minimal amount, what
23 range would that be in?
24    A.  I don't know.  I don't think it was
25 more than 1,000 bucks each or something.

1     Q.  In addition to the $1,000 each that
2  the GKPS investors put into HSC and the
3  approximately $1,000 each the GKPS investors put
4  into GKPS, did any of the four of you ever invest
5  additional money into GKPS?
6     A.  No.
7     Q.  And you talked about two bank loans
8  just now, I believe; is that correct?
9     A.  Yes.
10    Q.  And who arranged these bank loans?
11    A.  Well, I arranged, did most of the
12 work on Healthcare Business Credit.  And then I
13 guess Bobbie and I jointly worked on the one with
14 Western National Bank.
15    Q.  So the Healthcare Business Credit
16 loan came first?
17    A.  It was pretty much simultaneously.
18    Q.  And who came up with the capital
19 structure of loans from two separate banks?
20    A.  Well, I did.
21    Q.  And what was your thinking?
22    A.  Well, basically, when we went to
23 Healthcare Business Credit, they agreed to provide
24 financing on the two hospitals, and wanted an
25 additional million dollars with that.

1     And so both on the Healthcare
2  Business Credit and the Western National Bank
3  loans, we had to sign joint and severally, and
4  that provided financing of the hospitals.
5     And the original projections showed
6  that we, you know, would repay all those loans,
7  you know, out of the profits of the hospitals.
8     Q.  And did the banks lend just based
9  on pro forma projections?
10    A.  Well, no, they -- well, Western
11 National Bank would have loaned it to us based
12 upon to the financial standing of Bobbie and all
13 of us individually, and Healthcare Business
14 Credit, as well.  But Healthcare Business Credit
15 is a receivables based lending company.  So they
16 would have based it on our receivables, as well.
17    Q.  Did Healthcare Business Credit
18 require an appraisal on the Oregon hospitals?
19    A.  Yes.
20    Q.  Who performed the appraisal?
21    A.  I don't remember the name of the
22 company, but I think I provided the two
23 appraisals.  I don't remember their name.  It's an
24 independent consulting firm.
25    Q.  Where is that firm?  I'm sorry,

Page 61

1 affect how you get reimbursed by Medicare.
2      Q. And so why was that an advantage of
3 buying the existing entities?
4      A. If you didn't buy the existing
5 entities, then those monies would have been
6 retained by Healthmont.
7      Q. Couldn't you have bought that as an
8 asset as part of your purchase?
9      A. I don't think so.
10      Q. And did you have any other benefits
11 or detriments to this legal structure in addition
12 to cost report recovery of one million dollars?
13      A. Well, yeah, I mean the other
14 detriment was that we were assuming their existing
15 liabilities, so, yeah, that was a negative of, you
16 know, we thought we had identified during due
17 diligence, you know, all their possible, as best
18 we could, their liabilities.
19      Q. Were there subsequently any
20 surprises on the asset or liabilities side coming
21 out of the Healthmont entities?
22      A. There were a couple of lawsuits
23 that got filed after we bought them for stuff that
24 happened prior to when we bought them. I think
25 that was the major thing.

Page 62

1      Q. What kind of lawsuits?
2      A. I think there was an employee
3 dismissal lawsuit. And, actually, I think there
4 were two different employee lawsuits is what they
5 were.
6      Q. Was there separate management for
7 the different Symphony entities, or were they
8 jointly managed?
9      A. It's a combination. Each had its
10 own CEO. The financial team was shared by both
11 hospitals. And then each had a chief nursing
12 officer.
13      Q. Okay. Now, I think your answer
14 pertained to the hospitals. I was asking you
15 about Symphony One, Two, Three, Four, and Five.
16      A. Oh.
17      Q. Did they have separate --
18      A. Yeah. Well, the only management
19 person, there was myself, and then there were
20 maybe at the max period two other people that
21 worked for Symphony, or three.
22      Q. Okay. So who are the people who
23 worked for Symphony?
24      A. Myself. We had a lady that worked
25 for us for a time named Jessica Austin who

Page 63

1 basically was an administrative assistant and did
2 a lot of other things.
3      I had an accountant that worked for
4 us for a time. His name was Jeff something. I
5 don't remember his last name. And then Jack
6 Julius worked for the entity for a while, as well.
7      Q. Okay. So you said you worked for
8 Symphony. Are you using that term synonymously
9 with GKPS or separately?
10      A. It's one in the same. Symphony is
11 only a doing business name as, so.
12      Q. Okay. So did Symphony One have any
13 employees?
14      A. No.
15      Q. Symphony Two have any employees?
16      A. No.
17      Q. Symphony Three have any employees?
18      A. No.
19      Q. Symphony Four have any employees?
20      A. Yes.
21      Q. And were those the employees of
22 Eastmoreland Hospital?
23      A. Yes.
24      Q. Any additional employees?
25      A. No.

Page 64

1      Q. Did Symphony Five have any
2 employees in addition to the employees at Woodland
3 Park Hospital?
4      A. No.
5      Q. And so the employees you just
6 described at Symphony were really GKPS employees;
7 is that correct?
8      A. Yes.
9      Q. And so what was your function with
10 GKPS?
11      A. I was CEO and president. Plus, you
12 know, I was the CFO, the HR director, the managed
13 care director, the cost report expert. I did
14 everything.
15      Q. So it sounds like you had a lot of
16 responsibility at GKPS?
17      A. That's correct.
18      Q. Was that an awful lot of work?
19      A. Yes.
20      Q. Was that more work than any job
21 you'd ever had previously?
22      A. I don't know that, but it was a lot
23 of work.
24      Q. A lot of pressure, also?
25      A. Not anything unusual.

REPORTER'S CERTIFICATE

STATE OF TENNESSEE )
                   )  SS.
COUNTY OF DAVIDSON )

I, Lisa C. Hobbs, Court Reporter and Notary Public at Large, hereby certify that I reported the foregoing deposition on the Stenograph shorthand machine to the best of my skills and abilities and thereafter the same was reduced to typewritten form, by me, consisting of 160 pages.

I further certify that I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of these proceedings.

Lisa C. Hobbs, Court Reporter
and Notary Public at Large

My Commission Expires:
July 19, 2008

EXHIBIT A
Page 6 of 6

Compressed page 41

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF OREGON

```
IN RE:                    )
GKPS, INC., et al.,       ) CASE NO. 04-34670-tmb11
   Debtors in Possession  ) (Jointly Administered)
                          )
```
-------------------------------------------------

THE 2004 EXAMINATION OF:

KENNETH W. PERRY
June 2, 2005

VIDEO CONFERENCE

-------------------------------------------------

I N D E X

DIRECT EXAMINATION BY MR. FIELD..........Page   3

COPY

-------------------------------------------------
-------------------------------------------------
LISA C. HOBBS
Court Reporter
615 Truxton Drive
Nashville, Tennessee   37214
Phone:  (615) 902-0288

---

The 2004 Examination of Kenneth W. Perry, taken pursuant to agreement at U.S. Trustee's Office, 701 Broadway, Nashville, Tennessee, beginning at 10:30 a.m., CST, at the instance of counsel for the Committee of Unsecured Creditors, pursuant to the provisions of the Federal Rules of Bankruptcy Procedure.

All formalities as to notice, caption, with the exception of reading and signing of the deposition by the witness are waived. All objections except as to form of the question are reserved for the hearing.

-------------------------------------------------

A P P E A R A N C E S

FOR MR. PERRY:

MR. RANDAL S. MASHBURN
Attorney at Law
Baker, Donelson, Bearman,
Caldwell & Berkowitz, PC
Commerce Center, Suite 1000
211 Commerce Street
Nashville, Tennessee   37201

VIA VIDEO CONFERENCE:
FOR THE COMMITTEE OF UNSECURED CREDITORS:

MR. JOSEPH A. FIELD
Attorney At Law
Field & Associates
610 S.W. Alder
Suite 910
Portland, Oregon   97205

ALSO PRESENT:

MS. VIVIAN POPPERL

EXHIBIT   B
Page  1  of  3

---

Page 3

1    KENNETH W. PERRY,
2  having been first duly sworn, was examined and
3  deposed as follows:
4
5  DIRECT EXAMINATION BY MR. FIELD:
6      Q.  Mr. Perry, we're here for your
7  continued Bankruptcy Rule 2004 Exam in the GKPS
8  case, and we went through all the preliminary
9  questions the last time.  And do you remember the
10  preliminary questions we went through about a 2004
11  exam?
12      A.  Yes.
13      Q.  Okay.  And just one brief thing.
14  Today, are you under any medication, or is there
15  anything affecting your ability to understand my
16  questions or accurately answer?
17      A.  Just taking some Sudafed.
18      Q.  Okay.  Very well.  Well, again, if
19  I ask a question that you have trouble
20  understanding or it's not perfectly clear to you,
21  rather than answer, would you ask me to rephrase
22  my question so we can be perfectly clear?
23      A.  Yes.
24      Q.  Thank you.  Okay.  Before we go
25  into exhibits, I just wanted to pick up one line

Page 4

1  of questioning from the last time, and that is I
2  believe there were four investors in GKPS, Roberta
3  Kale, Dr. Gadasalli, Dr. Srivastava, and you;
4  correct?
5      A.  Yes.
6      Q.  Were any of your relatives or
7  relatives of the other investors involved in GKPS
8  or Portland hospitals in any way?
9      A.  No.
10      Q.  Okay.  And you recall from the last
11  2004 exam when we started that when I say GKPS or
12  the Portland hospitals, I'm referring to GKPS,
13  Hospital and Surgical Center Management Services,
14  Symphony Healthcare One through Five, Eastmoreland
15  Hospital, and Woodland Park.
16          And for efficiency, rather than
17  repeat all those names, when I say the Portland
18  hospitals or GKPS, I refer to everything; is that
19  fair?
20      A.  Yes.
21      Q.  All right.  And if you have an
22  answer that only refers to one of those specifics,
23  and you're going to articulate in that answer,
24  let's make that clear; is that fair?
25      A.  Yes.

1  of the principals put, you thought, $1,200 or
2  $2,000 in, and that bank account was active for
3  two months and no more time, and you're working on
4  getting the bank records, but haven't been able
5  to. Is that still active?
6     A.  Well, I didn't say it was active
7  for two months. It was a few months. I did find
8  a couple of bank statements the other day when I
9  was moving, actually, and so I've got those and
10  have put in a request to First American to get the
11  rest of them. The two that I have don't show
12  anything. They have a balance of like $30 on
13  them.
14     Q.  Okay. And was there ever money
15  that flowed out of GKPS that got paid to HSC?
16     A.  No.
17     Q.  And you would be familiar with any
18  bookkeeping or accounting entries that show money
19  going from GKPS to HSC?
20     A.  Yes. I mean I would know about it
21  if it would have happened.
22     Q.  And do you know if that ever
23  happened?
24     A.  Not that I'm aware of.
25     Q.  Okay. So as far as you know, HSC

1  is an entity that you started for the purpose of,
2  the same purpose of GKPS, and it's an entity that
3  you abandoned, it didn't serve any purpose.
4     A.  Basically, yes. That's according
5  to the lawyers, I just took their advice.
6     Q.  Okay. And when you raised money to
7  purchase the hospitals in Portland, the debtor
8  entity, meaning the borrower for HBCC, and the
9  borrower for Western National Bank was HSC;
10  correct?
11     A.  No.
12     Q.  Who was the borrower on each of
13  those loans?
14     A.  Well, the borrower on the HBCC is
15  listed as GKPS and then each of us individually.
16     Q.  Okay.
17     A.  And then I believe the note, and I
18  don't have it in front of me, with Western
19  National Bank lists HSC, GKPS, and then each of us
20  individually.
21     Q.  And do you know why HSC is the
22  borrower on the Western National Bank if it's an
23  entity you weren't using?
24     A.  Well, I think when we first
25  started, we thought we were going to use HSC.

1  That's the way the documents had got drafted up.
2  And, you know, as far as the bank was concerned,
3  we were guaranteeing this thing personally, so I
4  don't think they really cared what entity it was
5  being borrowed under.
6     Q.  And have you ever met with Dan
7  Holman in his office?
8     A.  Oh, yeah.
9     Q.  And have you ever met him anywhere
10  outside of his office?
11     A.  Sure, in Odessa.
12     Q.  Okay. And what business have you
13  worked on with Dan Holman as an attorney other
14  than GKPS formation and HSC formation?
15     A.  Oh, I don't know right offhand. I
16  don't know.
17     Q.  Can you think of anything else?
18     A.  No. I said I couldn't.
19     Q.  Was he involved in your business
20  with Alliance Hospital at all?
21     A.  I know he did work for Alliance. I
22  don't know that I really did anything with him
23  related to Alliance.
24     Q.  You mentioned that you had a
25  consulting fee from the designer and contractor at

1  Alliance.
2     A.  Yes.
3     Q.  Did Dan Holman represent you in
4  that capacity?
5     A.  No.
6     Q.  And did Dan Holman do any work for
7  BulldogIT?
8     A.  I don't think so. He represented
9  Alliance Hospital.
10     Q.  Has he done any work for you
11  personally?
12     A.  No.
13     Q.  And do you have any investments
14  with him?
15     A.  No.
16     Q.  Okay. And in addition to exhibit
17  101, are you aware of any additional minutes for
18  shareholder or directors meetings for GKPS?
19     A.  There should be some minutes. I
20  thought I had provided everything that I had in my
21  possession.
22     Q.  Okay. What about HSC?
23     A.  There were never really any minutes
24  at all for it, I mean.
25     Q.  Okay. And for GKPS, were there

1 Services on page 1178, 1179, do you have any idea
2 about that?
3     A.  It's the same as the other two.
4 They should all be the same. I don't know why
5 they're different.
6     Q.  Do you, in fact, have any idea how
7 there was a $750,000 the first time, then around a
8 million, now there's 1.2 million? Any idea why
9 the amount is going up here?
10     A.  I don't. But I mean, you know, the
11 total loan was only a million dollars and then
12 plus interest. And, you know, Bobbie and I ended
13 up paying like three or four hundred thousand of
14 it back. So I don't know where some of these
15 other amounts and stuff are coming from.
16         But, you know, without having the
17 detail, I'd have to look at the actual detail and
18 go back and look at the bank statements to, you
19 know, kind of figure it out.
20     Q.  Okay. And all money where it's
21 reported here as Hospital and Surgical Center, all
22 payments from GKPS or its entities actually went
23 directly to Western National Bank. No money went
24 into an HSC bank account; is that right?
25     A.  No. That's correct.

1     Q.  And on page 1181, the $389,000 to
2 you, that's the same money that we've already seen
3 on the other statement of financial affairs;
4 correct?
5     A.  Correct.
6     Q.  And here's Shamrock Equipment,
7 airplane and pilot for board members, September
8 '03. Do you have any recollection about that?
9     A.  Well, we've already discussed it.
10 That was, you know, for one of the board trips. I
11 don't know if it was to Nashville or Oregon, so.
12     Q.  Okay. And one final question. You
13 stated at first you were sure there was no money
14 that went into BulldogIT, then there were a few
15 transactions we saw with money going to Bulldog.
16 And you didn't know about those transactions,
17 except that last $50,000 which you thought was a
18 loan to Bulldog which you thought got paid back.
19     A.  Yeah, I really don't remember, you
20 know, what exactly happened. I'd have to go back
21 and look at the detail. I guess it looks we could
22 have loaned some money or whatever.
23         But I do know that when we, you
24 know, shut down Symphony and Bulldog was going,
25 there wasn't any receivable or payable back to

1 either one of them.
2     Q.  All right. Well, thank you for
3 being accommodating today. What I'll do is send
4 an e-mail. I'll go through my notes. I'll send
5 an e-mail to your attorney. We've discussed a few
6 documents which we don't have.
7         And I'll send your attorney an
8 e-mail, and see if we can get those documents.
9 And if I have more questions, I'll speak to your
10 attorney about continuing this exam to answer
11 them, or perhaps we can do that informally.
12     A.  Okay. Not a problem.
13     Q.  Well, thank you everyone.
14         FURTHER DEPONENT SAITH NOT.

REPORTER'S CERTIFICATE

STATE OF TENNESSEE  )
                    )  SS.
COUNTY OF DAVIDSON  )

    I, Lisa C. Hobbs, Court Reporter and Notary
Public at Large, hereby certify that I reported
the foregoing deposition on the Stenograph
shorthand machine to the best of my skills and
abilities and thereafter the same was reduced to
typewritten form, by me, consisting of 187 pages.

    I further certify that I am not related to any
of the parties named herein, nor their counsel,
and have no interest, financial or otherwise, in
the outcome of these proceedings.


            Lisa C. Hobbs, Court Reporter
            and Notary Public at Large

            My Commission Expires:
            July 19, 2008

1                 IN THE UNITED STATES BANKRUPTCY COURT

                    FOR THE DISTRICT OF OREGON

2

     IN RE:                      )   CASE NO. 04-34670-tmb11

3                                )

     GKPS, INC., et al.,         )   Chapter 11

4                                )

                    Debtor       )   Jointly Administered

5

6

7

              ORAL AND VIDEOTAPED DEPOSITION OF

8                  SUDHIR SRIVASTAVA, M.D.

                    Taken May 10, 2005

9

10

11                 ORAL AND VIDEOTAPED DEPOSITION OF SUDHIR

12   SRIVASTAVA, M.D., produced as a witness at the instance

13   of the Committee of Unsecured Creditors, and duly sworn,

14   was taken in the above styled and numbered cause on May

15   10, 2005, from 5:16 to 7:41, via telephone, in the

16   offices of Sudhir Srivastava, M.D, 1330 East 8th Street,

17   Suite 102, Odessa, Texas, before Leland Gamblin,

18   Certified Shorthand Reporter Number 4680 in and for the

19   State of Texas, reported by computerized stenotype,

20   pursuant to the Federal Rules of Bankruptcy Procedure

21   (and the provisions stated on the record or attached

22   therein).

23

24                                       EXHIBIT   C
                                         Page 1 of 4
25

EXHIBIT C
Page 2 of 4

4

1        THE VIDEO TECHNICIAN:  This deposition is
2   being taken in Cause Number 04-34670-tmb11, styled In
3   Re: GKPS, Incorporated, et al., filed in the United
4   States Bankruptcy Court in the District of Oregon.
5        For identification purposes, my name is
6   Joe Lilly, the video technician.  We're here today for
7   the purpose of taking the deposition of the witness,
8   Dr. Sudhir Srivastava, on May the 10th, 2005, in the
9   offices of Dr. Srivastava, in Odessa, Texas.  The time
10  is approximately 17:16.
11        Will all present please state your
12  appearances for the record at this time.
13        MR. ROUSE:  Randy Rouse and Dan Hollmann,
14  for Dr. Srivastava.
15        THE COURT REPORTER:  Leland Gamblin, court
16  reporter.
17        THE WITNESS:  Sudhir Srivastava.
18             SUDHIR SRIVASTAVA,
19  having been first duly sworn (or affirmed), testified as
20  follows:
21             EXAMINATION
22  BY MR. FIELD:
23   Q.  Dr. Srivastava, we have spoken before.  I am
24  Joe Field, in Portland, Oregon.  I am the attorney for
25  the Committee of Unsecured Creditors in the consolidated

5

1   bankruptcy cases for which the court reporter gave the
2   number earlier.  And we are conducting this 2004 Exam on
3   the telephone, with a court reporter and videographer in
4   your office in Texas.  And you're understanding clearly?
5   A.  Yes.
6   Q.  Because we're on the telephone, if there's any
7   time when we have an interruption or you have difficulty
8   understanding, will you please let me know?
9   A.  Yes.
10  Q.  You know, just so you know, I'm sitting here,
11  as we discussed, with Tim Conway, who is attorney for
12  the debtor, and with Vivian Cottrel, who is the attorney
13  for the U.S. Trustee's Office here in Portland.
14        Have you ever been in a deposition before?
15  A.  Yes.
16  Q.  How many depositions have you been in before
17  today?
18  A.  I don't know.  Maybe 20, approximately,
19  somewhere in that neighborhood.
20  Q.  And did you have an opportunity to speak with
21  your attorney before today's deposition?
22  A.  Yes.
23  Q.  All right.  And I'm going to very briefly go
24  over the ground rules.  Do you understand that the court
25  reporter is writing down everything that each of us

6

1   says --
2   A.  Yes.
3   Q.  -- correct?
4   A.  Yes.
5   Q.  And you understand the court reporter can only
6   write what one person says at a time, correct?
7   A.  Yes.
8   Q.  So you agree that when I'm speaking, you'll
9   allow me to finish, so the court reporter can write
10  everything that I say?
11  A.  Yes.
12  Q.  And I will extend the same courtesy to you, but
13  I ask that if you have more to say when I start talking,
14  if you ask -- that you say, "Excuse me," so I give you
15  the opportunity to finish.  Is that fair?
16  A.  Yes.
17  Q.  Are you on any medication, or is there anything
18  else today that affects your ability to clearly
19  understand my questions and answer to the best of your
20  recollection?
21  A.  No.
22  Q.  If you want to take a break at any time during
23  the deposition, do you agree to answer whatever question
24  is pending and then indicate your need or desire to take
25  a break?

7

1   A.  Okay.
2   Q.  And if your pager goes off from a patient, and
3   you think it's an emergency, please tell us, and we can
4   stop what we're doing so you can tend to that.  Okay?
5   A.  Yes.
6   Q.  Do you know -- when I switch topics today, I
7   will inform you each time we switch topics, so you know
8   where we're going.  Is that fair?
9   A.  All right.
10  Q.  And we've had the chance to informally talk,
11  before, with your attorneys present, and so hopefully,
12  there'll be no surprises.
13        You understand the purpose of this 2004
14  Examination, correct?
15  A.  Yes.
16  Q.  Okay.  For starters, you mentioned that you
17  have been in approximately 25 depositions.  Have all of
18  those been in Texas?
19  A.  Yes.
20  Q.  And how many of those have been in cases in
21  which you have personally been a party to a lawsuit?
22  A.  Maybe ten, approximately.
23  Q.  And of those ten, were any of them business
24  disputes?
25  A.  I think there was one time.  It was a long time

EXHIBIT __C__
Page __3__ of __4__

**28**

1    A.   Hailey --

2    Q.   Heidi Iverson.

3    A.   That's not his wife.  His wife's name, also, is

4  Hailey, isn't it?

5    Q.   This is -- I don't know this to be --

6    A.   No, I do not know that person, then.

7    Q.   I want to switch topics and talk about your

8  investments in the hospitals in Oregon.  You talked

9  about forming GKPS and of perhaps putting 1- to $5,000

10  in and of guaranteeing bank loans.  Do you have

11  recollection about how you raised the capital to acquire

12  the hospitals in Oregon?

13    A.   I think there was a bank note that was carried

14  -- or that bank carried the note on these properties.

15  And then I think we had borrowed a million dollars,

16  roughly, from Western National Bank that we had

17  guaranteed.  So that's really my recollection, that

18  there was a carried note and this million dollars that

19  we borrowed.

20    Q.   Did you ever have other dealings with Western

21  National Bank?

22    A.   Yes.

23    Q.   Did you introduce Ken Perry and Roberta Kale to

24  Western National Bank?

25    A.   We introduced Roberta to Western National Bank

**29**

1  during the phase of financing of Alliance Hospital.  I

2  think Roberta must have introduced Ken Perry to the

3  Western National Bank.  I did not.

4    Q.   Who do you deal with at Western National Bank?

5    A.   Jack Wood is the president, and Paul Lucas,

6  he's, I think, a senior vice-president at this time.

7    Q.   Can you spell their last names?

8    A.   Lucas, L-U-C-A-S.

9    Q.   And Wood?

10    A.   Yeah, Jack Wood.

11    Q.   W-O-O-D?

12    A.   Yes.

13    Q.   Okay.  What other business do you have with

14  Western National Bank besides the million-dollar loan?

15    A.   I have personal loans.  I had personal loans

16  with them, and, I think, operate -- working capital loan

17  with the Western National Bank, and customer

18  relationship, as account holder.

19    Q.   How many years have you done business with

20  Western National Bank?

21    A.   Probably 12, 13 years, somewhere in that time

22  frame.

23    Q.   And so the four of you, being you,

24  Dr. Gadasalli, Roberta Kale, and Ken Perry, when I say,

25  "The four of you," that's who I will be referring to,

**30**

1  okay?  Is that fair?

2    A.   Yes.

3    Q.   The four of you borrowed $1 million from

4  Western National Bank, correct?

5    A.   Yes.

6    Q.   And did that money go into the purchase of the

7  Oregon hospitals?

8    A.   I really do not know the details as to how

9  those funds were utilized, but I assume that it was part

10  of that acquisition.

11    Q.   Do you know where the rest of the funding came

12  from for that acquisition?

13    A.   I think there was Credit Corp. or -- I don't

14  remember the name now, but the lending entity that had a

15  note essentially carried the note.

16    Q.   Do you know who the borrower was on the

17  million-dollar loan from Western National Bank?

18    A.   I think it was GKPS.  And we had personally

19  guaranteed, as individuals.

20    Q.   Okay.  Do you know if GKPS has paid that back?

21    A.   I think -- I don't know whether it's GKPS or

22  Roberta Kale and Ken Perry paid it off.  I know some

23  amounts were paid from the operations or however -- I

24  think Ken had it structured.  So I know some amounts

25  were paid, and the rest was paid by Ken Perry and

**31**

1  Roberta Kale.

2    Q.   Okay.  Have you ever heard of something called

3  Hospital and Surgical Center Management Services, LLC,

4  of Tennessee, a Limited Liability Company?

5    A.   Not until you pointed it out during our last

6  conversation, no.

7    Q.   How about Hospital and Surgical Center

8  Management Services, LP, a Nevada Limited Partnership?

9    A.   No, not, again, until our conversation.

10    Q.   Do you know how many employees GKPS has?

11    A.   No.

12    Q.   Do you know if it has any employees?

13    A.   No, I don't know whether there were any

14  employees within GKPS, itself, because I thought it was

15  just a partnership.

16    Q.   Do you know if GKPS shared office space with

17  Bulldog I.T.?

18    A.   I'm sorry.  I didn't hear that completely.

19    Q.   Do you know if GKPS shared office space with

20  Bulldog I.T.?

21    A.   No.

22    Q.   So when -- I'm going to change topics.  And

23  we've gone about an hour.  Would you like to take a

24  brief break, or would you prefer to continue?

25    A.   I think if I can just take two minutes' break.

```
                                                              96
1          FURTHER CERTIFICATION
2
           The original deposition (was / was not)
3   returned to the deposition officer;
4          If returned, the attached Changes and Signature
    page contains any changes and the reasons therefor;
5
           If returned, the original deposition was
6   delivered to Mr. Joseph Field, Custodial Attorney;
7          I further certify that my charges for
    preparing this deposition are as follows:
8
           Original Deposition $
9          Copying of Exhibits $
           Mileage $
10         To Be Paid By Mr. Joseph Field
11         Certified this     day of        , 2005.
12
13
14
15         LELAND GAMBLIN
           CSR No. 4680 - Expires 12/31/06
16         Permian Court Reporters, Inc.
           Firm Registration No. 155
17         605 W. Texas Avenue
           Midland, Texas 79701
18         (432) 683-3032
19
20
21
22
23
24
25
```

EXHIBIT C
Page 4 of 4

1              IN THE UNITED STATES BANKRUPTCY COURT

               FOR THE DISTRICT OF OREGON

2

     IN RE:                    )    CASE NO. 04-34670-tmb11

3                              )

     GKPS, INC., et al.,       )    Chapter 11

4                              )

                    Debtor     )    Jointly Administered

5

6

7

       ORAL AND VIDEOTAPED DEPOSITION OF SURESH GADASALLI, M.D.

8                     Taken May 9, 2005

9

10

11             ORAL AND VIDEOTAPED DEPOSITION OF SURESH

12   GADASALLI, M.D., produced as a witness at the instance

13   of the Committee of Unsecured Creditors, and duly sworn,

14   was taken in the above styled and numbered cause on May

15   9, 2005, from 5:54 to 7:54 p.m., via telephone, in the

16   offices of Suresh Gadasalli, M.D., 500 East 4th Street,

17   Odessa, Texas, before Leland Gamblin, Certified

18   Shorthand Reporter Number 4680 in and for the State of

19   Texas, reported by computerized stenotype, pursuant to

20   the Federal Rules of Bankruptcy Procedure (and the

21   provisions stated on the record or attached therein).

22

23

24

25

**5**

1  MR. FIELD: Who do we have on the phone,
2  please?
3     MR. ROUSE: We have Dr. Gadasalli, the
4  witness that you have subpoenaed. My name is Randy
5  Rouse. I'm an attorney here with the doctor.
6     And his corporate counsel, Dan Hollmann,
7  is here as well.
8     THE COURT REPORTER: And my name is Leland
9  Gamblin, the court reporter.
10    THE VIDEO TECHNICIAN: And I'm J.R.
11 Newcomer, the videographer.
12    MR. FIELD: Okay. Wait a second. Dan,
13 what corporation do you represent today?
14    MR. HOLLMANN: I'm sorry?
15    MR. FIELD: What corporation do you
16 represent?
17    MR. HOLLMANN: I represent Dr. Gadasalli
18 and his various entities. I just don't represent him in
19 this bankruptcy.
20    MR. ROUSE: Now, he's here with
21 Dr. Gadasalli as another counsel.
22    MR. FIELD: For Dr. Gadasalli in his
23 personal capacity or corporate capacity?
24    MR. ROUSE: Personal.
25    MR. FIELD: Okay. So we have two

**6**

1  attorneys here for Dr. Gadasalli, personally, correct?
2     MR. ROUSE: That's correct.
3     MR. FIELD: Could you swear in the
4  witness?
5     THE VIDEO TECHNICIAN: Just a moment,
6  please.
7     This deposition is being taken in Cause
8  Number 04-34670-tmb11, titled GKPS, Inc., et al. It is
9  filed in the United States Bankruptcy Court, District of
10 Oregon.
11    For identification purposes my name is
12 J.R. Newcomer, the video technician. And the court
13 reporter is Leland Gamblin.
14    We're here today for the purpose of taking
15 the deposition of the witness, Dr. Suresh Gadasalli, and
16 we are in his offices at 500 West 4th Street, Odessa,
17 Texas.
18    Counsel will state their appearance for
19 the record.
20    MR. ROUSE: Randy Rouse, for
21 Dr. Gadasalli.
22    MR. HOLLMANN: Dan Hollmann, for
23 Dr. Gadasalli.
24    MR. FIELD: Could each of you state your
25 law firm?

**7**

1     MR. ROUSE: Lynch, Chappell & Alsup, out
2  of Midland, Texas.
3     MR. HOLLMANN: Hollmann, Lyon, Patterson &
4  Durell, out of Odessa, Texas.
5     MR. FIELD: Okay.
6     THE VIDEO TECHNICIAN: The time is
7  approximately 5:54 p.m. on May 9, 2005, and we are now
8  on the record. The reporter will please swear the
9  witness.
10    SURESH GADASALLI, M.D.,
11 having been first duly sworn (or affirmed), testified as
12 follows:
13    EXAMINATION
14 BY MR. FIELD:
15  Q.  Dr. Gadasalli, this is Joe Field.
16  A.  Hi.
17  Q.  Hi. Can you hear me all right?
18  A.  Yes, sir.
19  Q.  Okay. We're on the telephone, and I'm in
20 Portland, Oregon with attorney Tim Conway, for the
21 debtor, and CPA Allen Tienter, for the U.S. Trustee.
22 You're in Texas with your two attorneys and a court
23 reporter and videographer.
24    If at any time you cannot hear my
25 question, then please interrupt and tell us that you

**8**

1  cannot hear.
2  A.  Yes, sir.
3  Q.  If we disconnected, we don't have your
4  telephone number there, so will you call us back?
5  A.  Yes, sir.
6  Q.  Have you ever been in a deposition before?
7  A.  Yes, sir.
8  Q.  And have you had the opportunity to speak with
9  your lawyers before today's 2004 Examination?
10 A.  Yes, sir.
11 Q.  So you know why you're here today?
12 A.  Yes, sir.
13 Q.  Are you on any medication that could affect
14 your ability to participate in this 2004 Examination?
15 A.  What kind of medication would you mean, sir?
16 Q.  Anything that affects your ability to listen to
17 my questions, understand them, and answer to the best of
18 your recollection?
19 A.  No, sir.
20 Q.  Okay. And you understand that there's a court
21 reporter writing down everything that I ask and writing
22 down your answers, correct?
23 A.  Yes, sir, I do.
24 Q.  And you understand that he cannot write down
25 what two people say at once, so will you agree that when

21

1    Q.   Did you ever receive a full accounting?
2    A.   Never.
3    Q.   And did he provide you annual statements for
4    all of these different entities involved in GKPS'
5    ownership of the hospitals in Oregon?
6    A.   Not to me personally.
7    Q.   To anyone you know?
8    A.   I don't know if he gave it to my accountant or
9    not.
10   Q.   And do you have any suspicion of foul play in
11   Ken Perry's handling of the financial affairs of the
12   entities in Oregon?
13   A.   Well, I mean, I don't have anything objective
14   to go on, but I suspect there is something going on.
15   Q.   And what are the factors that lead you to have
16   that suspicion?
17   A.   Well, one, nonaccountability and, you know,
18   not -- I'm sorry. I'm just going to adjust my
19   microphone here, sir. Excuse me for a moment.
20         He did not account for what was going on.
21   And, initially, the hospitals were doing fairly well and
22   making some money, and then all of a sudden, you know,
23   we were told that things were going rather sour, and the
24   project was looking doomed.
25   Q.   Are you aware of any objective change in

22

1    circumstances that materially affected the performance
2    of the hospitals?
3    A.   What I was told, that there weren't some
4    insurances who wanted to work at this hospital or be
5    involved with these hospitals and that the Oregon
6    Medicaid payments had changed. So, mostly, insurance
7    stuff was what I was told.
8    Q.   When you say, "Was what I was told," who told
9    you this?
10   A.   Ken Perry did.
11   Q.   Did you believe that?
12   A.   At that point, I did, yes.
13   Q.   Subsequently?
14   A.   At this point, I don't know. I'm confused as
15   to what the truth is.
16   Q.   Okay. Were you on the board of directors of
17   any entities that owned or managed Woodland Park
18   Hospital or East Moreland Hospital?
19   A.   Not on the hospital boards, no, sir.
20   Q.   Are you on the boards of any other entities?
21   A.   I think I was part of GKPS. All four of us
22   were directors.
23   Q.   Yes?
24   A.   And I was one of the directors.
25   Q.   Were you a director of one of the five Symphony

23

1    Healthcare entities?
2    A.   I was a director of GKPS and not -- I don't
3    know about the Symphony entities.
4    Q.   Have you ever heard of Hospital and Surgical
5    Center Management Services, LLC?
6    A.   Yes, sir, I have heard recently of it.
7    Q.   What do you know about it?
8    A.   Not much.
9    Q.   Have you heard of Hospital and Surgical Center
10   Management Services, LP?
11   A.   No, sir.
12   Q.   Do you know of a distinction between those two
13   entities?
14   A.   No, sir, I don't.
15   Q.   And in your capacity as a director of GKPS, how
16   often did you receive information on the performance of
17   its hospitals in Oregon?
18   A.   We wanted Ken to give it -- give us information
19   every quarter, but we probably got it every six months
20   to eight months or so.
21   Q.   Did you feel the information was complete when
22   you received it?
23   A.   No, we didn't feel it was complete or adequate,
24   and then we would ask him to do a better job, and he
25   would say, "Okay, we'll take care of it," something to

24

1    that effect. At that point, we trusted -- I trusted
2    Roberta Kale to sort of deal with Ken Perry.
3    Q.   And do you believe she was successful in that
4    endeavor?
5    A.   We felt that she knew what she was talking
6    about as far as the hospital business side was
7    concerned, because, you know, running a hospital was not
8    what I do, and so we would rely on her advice. And she
9    would, you know, tell us that, you know, "Ken didn't do
10   this" or, "Ken didn't do that, and this is what we need
11   to ask him, or this is what needs to be done."
12         And, you know, I would go along with it.
13   Q.   And at this time, when you look back, do you
14   feel that Roberta Kale did her job as a director of
15   GKPS?
16   A.   Initially, yes.
17   Q.   And do you feel that at some point, it was
18   Roberta Kale and Ken Perry against you and
19   Dr. Srivastava?
20   A.   I don't have any proof of it, but, you know,
21   the thought has come to my mind that maybe they did.
22   Q.   And do you believe that Roberta Kale was privy
23   to more information and goings-on at GKPS than you and
24   Dr. Srivastava were?
25   A.   At least more than me, yes, sir.



85

1  IN THE UNITED STATES BANKRUPTCY COURT
   FOR THE DISTRICT OF OREGON
2
   IN RE:        ) CASE NO. 04-34670-tmb11
3                )
   GKPS, INC., et al.,   ) Chapter 11
4                )
      Debtor    ) Jointly Administered
5
6
7      COURT REPORTER'S CERTIFICATE
       ORAL DEPOSITION OF SURESH GADASALLI, M.D.
8          Taken May 9, 2005
9
10  I, Leland Gamblin, Certified Shorthand
    Reporter in and for the State of Texas, do hereby
    certify to the following:
11
       That the witness was duly sworn by the
12  officer and that the transcript of the oral deposition
    is a true record of the testimony given by the witness;
13
       That the deposition transcript was
14  submitted on       to the witness through attorney,
    Mr. Randall L. Rouse, for examination, signature, and
15  return to Permian Court Reporters by         ;
16     That the amount of time used by each party at
    the deposition is as follows:
17
       Mr. Field - 01:40;
18
       That pursuant to information given to the
19  deposition officer at the time said testimony was taken,
    the following includes all parties of record:
20
    FOR THE COMMITTEE OF UNSECURED CREDITORS:
21
       MR. JOSEPH A. FIELD (Via Telephone)
22     Field & Associates
       610 S.W. Alder Street
23     Suite 1600
       Portland, Oregon  97205
24     503-228-9115
25

86

1  FOR DEBTOR GKPS, INC.:
2     MR. TIM CONWAY (Via Telephone)
      Tonkon Torp
3     888 S.W. Fifth Avenue
      Suite 1600
4     Portland, Oregon  97204
      503-802-2027
5
   FOR THE DEPONENT:
6
      MR. RANDALL L. ROUSE
7     Lynch, Chappell & Alsup, P.C.
      300 North Marienfeld
8     Suite 700
      Midland, Texas  79701
9     915-683-3351
10    MR. DANIEL J. HOLLMANN
      Hollmann, Lyon, Patterson & Durell
11    5030 East University Blvd.
      Suite D-103
12    Odessa, Texas  79762
      432-363-1300
13
       I further certify that I am neither
14  counsel for, related to, nor employed by any of the
    parties in the action in which this proceeding was
15  taken, and further that I am not financially or
    otherwise interested in the outcome of the action.
16
       Further certification requirements
17  pursuant to Rule 203 of the Texas Rules of Civil
    Procedure will be complied with after they have
18  occurred.
19     Certified to by me this     day of
       , 2005.
20
21
22     LELAND GAMBLIN,
       CSR No. 4680, Expires 12/31/06
23     Permian Court Reporters, Inc.
       Firm Registration No. 155
24     605 W. Texas Avenue
       Midland, Texas 79701
25     (432) 683-3032

87

1      CHANGES AND SIGNATURE
2  PAGE LINE  CHANGE OR CORRECTION  REASON FOR CHANGE
3    -   -                 -
4    -   -                 -
5    -   -                 -
6    -   -                 -
7    -   -                 -
8    -   -                 -
9    -   -                 -
10   -   -                 -
11   -   -                 -
12
       I, SURESH GADASALLI, M.D., have read the
13  foregoing deposition and hereby affix my signature that
    the same is true and correct, except as noted above.
14
15
       SURESH GADASALLI, M.D.
16
    THE STATE OF TEXAS  )
17  COUNTY OF        )
18
       Before me,        , on
19  this day personally appeared SURESH GADASALLI, M.D.,
    known to me to be the person whose name is subscribed to
20  the foregoing instrument and acknowledged to me that
    he/she executed the same for the purposes and
21  consideration therein expressed.
       Given under my hand and seal of office
22  this     day of       , A.D.,      .
23
24
       NOTARY PUBLIC
25     My Commission expires:

88

1      FURTHER CERTIFICATION
2
3      The original deposition (was / was not)
   returned to the deposition officer;
4
       If returned, the attached Changes and Signature
5  page contains any changes and the reasons therefor;
       If returned, the original deposition was
6  delivered to Mr. Joseph A. Field, Custodial Attorney;
7
       I further certify that my charges for
8  preparing this deposition are as follows:
9      Original Deposition $
       Copying of Exhibits $
10     Mileage $
       To Be Paid By Mr. Joseph A. Field
11
       A copy of this certificate was served on all
12  parties shown herein and filed with the Clerk.
13     Certified this     day of       , 2005.
14
15
16
17     LELAND GAMBLIN
       CSR No. 4680 - Expires 12/31/06
18     Permian Court Reporters, Inc.
       Firm Registration No. 155
19     605 W. Texas Avenue
       Midland, Texas 79701
20     (432) 683-3032
21
22
23  EXHIBIT  D
24  Page 4 of 4
25

25 (Pages 85 to 88)

# NOTE
## (Secured by Security Agreements)



**Date:** February 1, 2002

**Obligor:** HOSPITAL AND SURGICAL CENTER MANAGEMENT SERVICES, L.P., a Nevada Limited Partnership, acting by and through its General Partner, GKPS, Inc., a Delaware Corporation

**Obligor's Mailing Address (including county):**

> 5313 Franklin Road
> Nashville, Davidson County, Tennessee 37220

**Payee:** Western National Bank

**Place for Payment (including county):**

> P.O. Box 4597
> 2710 N. Grandview Avenue
> Odessa, Ector County, Texas 79760-4597

**Principal Amount: $1,000,000.00**

**Annual Interest Rate on Unpaid Principal from Date:**

> The Note shall bear interest at a varying rate per annum which shall be equal to the prime rate as set forth in the money section of the Southwest Edition of the Wall Street Journal "Prime Rate," plus 2.25%, such varying rate to change automatically, effective as of the date of each change in the Prime Rate, to reflect each such change in the Prime Rate, without notice to Obligor or any other person. The Prime Rate is currently 4.75% per annum. Interest on this Note shall be computed on a rate per annum based on a year of 360 days.

**Annual Interest Rate on Matured, Unpaid Amounts:**

> Maximum rate allowed by law. The maximum rate allowed by law means the greater of (a) the maximum rate of interest permitted under federal law, or (b) the "Quarterly Ceiling" as referred to in Texas Finance Code Section 303 *et seq* (Vernon's 1998).

**Terms of Payment (principal and interest):**

> Interest only is payable monthly as it accrues on 1st day of every month, beginning on March 1, 2002 and continuing regularly to February 1, 2003 when the entire amount of principal and interest remaining unpaid will be payable. Interest will be calculated on the unpaid principal to the date of each installment.

**Maturity Date:**        February 1, 2003

**Security for Payment**

**A Security Interest Created and Granted in the Following Security Agreements:**

>    **Date:**            February 1, 2002
>
>    **Debtor:**          ROBERTA A. KALE
>
>    **Secured Party:**   Payee
>
>    **Collateral:**      22,893 shares of IASIS Healthcare stock Certificate Number 149 and 11,359 shares of IASIS Healthcare Corporation stock, Certificate Number 150
>
>                         All undivided interest of Roberta A. Kale as a limited partner in and to that certain limited partnership named Hospital and Surgical Center Management Services, L.P., described in the limited partnership agreement dated November 5, 2001.
>
>    **Date:**            February 1, 2002
>
>    **Debtor:**          SURESH N. GADASALLI, M.D.
>
>    **Secured Party:**   Payee
>
>    **Collateral:**      All undivided interest of Suresh N. Gadasalli as a limited partner in and to that certain limited partnership named Hospital and Surgical Center Management Services, L.P., described in the limited partnership agreement dated November 5, 2001.
>
>    **Date:**            February 1, 2002
>
>    **Debtor:**          KEN PERRY
>
>    **Secured Party:**   Payee
>
>    **Collateral:**      All undivided interest of Ken Perry as a limited partner in and to that certain limited partnership named Hospital and Surgical Center Management Services, L.P., described in the limited partnership agreement dated November 5, 2001.
>
>                         44,100 shares of IASIS Healthcare stock Certificate Number 163.

EXHIBIT **E**
Page **2** of **5**

GKPS 0095

| | |
|---|---|
| **Date:** | February 1, 2002 |
| **Debtor:** | SUDHIR SRIVASTAVA, M.D. |
| **Secured Party:** | Payee |
| **Collateral:** | All undivided interest of Sudhir Srivastava as a limited partner in and to that certain limited partnership named Hospital and Surgical Center Management Services, L.P., described in the limited partnership agreement dated November 5, 2001. |

Obligor promises to pay to the order of Payee at the place for payment and according to the terms of payment the principal amount plus interest at the rates stated above. All unpaid amounts shall be due by the Maturity Date.

If Obligor defaults in the payment of this note or in the performance of any obligation in any instrument securing or collateral to it, and the default continues for ten (10) days after Payee gives Obligor notice of the default and the time within which it must be then Payee may declare the unpaid principal balance and earned interest on this note immediately due. Obligor and each surety, endorser, debtor, secondary olbigor and guarantor waive all further demands for payment, presentations for payment, notices of intention to accelerate maturity, notices of acceleration of maturity, protests, and notices of protest, to the extent permitted by law and hereby agree to all modifications, renewals, extensions, substitutions or replacements hereof or partial payments hereon and to any release or substitution of security, if any, hereof, in whole or in part, with or without notice, before or after the Maturity Date. This note may be transferred by the Payee and the rights and privileges of the Payee under this note shall inure to the benefit of the Payee's representatives, successors and assigns.

If Default (as hereinafter defined) shall occur then the holder of this note may immediately declare the outstanding principal balance of this note, together with all accrued and unpaid interest and any other sums that the Obligor may owe to Payee, under or in connection with this note or otherwise, (collectively, the "Indebtedness") to be at once due and payable, without further notice of any kind to the Obligor, all notices being expressly waived herein.

The occurrence of any one of the following shall constitute and is hereinafter defined as "Default":

    (i)    The Obligor does not pay or prepay any principal, interest or fees, if any, on or with respect to the Indebtedness; or

    (ii)    Any representation or warranty made by the Obligor in any writing furnished in connection with the Indebtedness shall be false in any material respect when made; or



EXHIBIT **E**

Page **3** of **5**

GKPS 0096

(iii)   The Obligor violates any covenant, agreement or condition contained in the loan agreement executed in connection with this note and such violation continues for a period of thirty (30) days from and after the written notice thereof from the Payee to Obligor; or

(iv)   The Obligor violates any other covenant, agreement or condition contained in any agreement, document or instrument executed in connection with or given as security for this note and such violation continues for a period of thirty (30) days from and after the written notice thereof from the Payee to Obligor; or

(v)   The Obligor makes an assignment for the benefit of creditors after the date hereof; or

(vi)   The Obligor admits in writing its inability to pay its debts as they mature, applies for any tribunal for the appointment of a trustee or receiver of any substantial part of the assets of the Obligor, or commences any proceedings relating to the Obligor under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt, dissolution or other liquidation law of any jurisdiction; or

(vii)   Any such application is filed, or any such proceedings are commenced, against the Obligor and the Obligor indicates its approval, consent or acquiescence, or any order is entered appointing such trustee or receiver, or adjudicating the Obligor bankrupt or insolvent, or approving the petition in any such proceedings, and such order remains in effect for thirty (30) days; or

If this note or any instrument securing or collateral to it is given to an attorney for collection or enforcement, or if suit is brought for collection or enforcement, or if it is collected or enforced through probate, bankruptcy, or other judicial proceeding, then Obligor shall pay Payee all costs of collection and enforcement, including reasonable attorney's fees and court costs, in addition to other amounts due.

No delay or failure by Payee to exercise or assert any right or remedy under this note or in any of the documents evidencing security for this note, or any acceptance by Payee of any late or partial payments hereunder, shall constitute a waiver or a bar to the exercise by Payee of any such right or remedy.

If any instrument granting a lien or security interest to Payee as security for the repayment of this note is invalid or unenforceable as to any part of the Indebtedness, or if the lien or security interest is invalid or unenforceable as to any part of the property comprising the security, the unsecured or partially secured portion of the indebtedness shall be completely paid prior to the payment of the remaining and secured or partially secured portion of the Indebtedness, and all payments made on this note, whether voluntary or under foreclosure or other enforcement action


EXHIBIT  E
Page  4  5

GKPS 0097

or procedure, shall be considered to have been first paid on and applied to the full payment of that portion of the Indebtedness which is not secured or fully secured by the lien or security interest granted in such security instrument.

Interest on the debt evidenced by this note shall not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law; any interest in excess of that maximum amount shall be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess shall be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides other provisions in this and all other instruments concerning the debt.

## IMPORTANT NOTICE TO YOU, THE OBLIGOR

This loan is payable in full at the Maturity Date. You must repay the entire principal balance of the loan and unpaid interest then due. You will, therefore, be required to make payment out of other assets that you may own, or you will have to find a lender willing to refinance the unpaid balance then owing. The Payee may be willing to refinance this loan but has no obligation to do so. If you refinance this loan at the Maturity Date, you may have to pay some or all of the closing costs normally associated with a new loan even if you obtain refinancing from the Payee.

THIS PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.


HOSPITAL AND SURGICAL CENTER
MANAGEMENT SERVICES, L.P.
A Nevada Limited Partnership

By: GKSP, INC.
Its: General Partner


KENNETH PERRY, President

Form 7
(12/03)

# FORM 7. STATEMENT OF FINANCIAL AFFAIRS

## UNITED STATES BANKRUPTCY COURT

### DISTRICT OF OREGON

In Re  Symphony Healthcare V, LLC  _____     Case No.  ___04-32593-tmb11___
(Name)                                                        (if known)
Debtor

### STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs.

Questions 1 - 18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19 - 25. If the answer to an applicable question is "None," mark the box labeled "None." If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

### DEFINITIONS

*"In business."* A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within the six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed.

*"Insider."* The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any owner of 5 percent or more of the voting or equity securities of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. § 101.

---

1. **Income from employment or operation of business**

None
☐

State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

AMOUNT                                    SOURCE (if more than one)

2004     1,155,858     Gross Hospital Revenue                FY: 1/01/04 to 1/31/04


EXHIBIT F
Page 1 of 2

GKPS 1125

Bankruptcy2004 ©1991-2004, New Hope Software, Inc. - ver. 3.7.0-608 - 31461

### Statement of Financial Affairs 3.b.
### Payments to Insiders

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|
| | 9/1/03 | 23,441.76 | |
| | 10/1/03 | 23,441.76 | |
| | 11/3/03 | 23,441.76 | |
| | 12/1/03 | 23,441.76 | |
| | | **$234,417.6** | Unknown |
| Hospital & Surgical Center Management Services 210 12th Avenue South, Suite 209 Nashville, TN 37203 Guaranteed Insider Debt | 3/17/02 | 1,750.00 | |
| | 4/18/02 | 6,027.78 | |
| | 5/08/02 | 5,833.33 | |
| | 6/03/02 | 6,027.77 | |
| | 7/01/02 | 5,833.34 | |
| | 8/01/02 | 6,027.77 | |
| | 9/03/02 | 6,027.78 | |
| | 10/01/02 | 5,833.33 | |
| | 11/03/02 | 6,027.78 | |
| | 12/02/02 | 5,513.89 | |
| | 3/31/03 | 10,652.78 | |
| | 4/30/03 | 5,597.22 | |
| | 4/30/03 | 5,416.67 | |
| | 4/30/03 | 100,000.00 | |
| | 4/30/03 | 50,000.00 | |
| | 7/08/03 | 50,000.00 | |
| | 7/08/03 | 4,604.17 | |
| | 8/03/03 | 50,000.00 | |
| | 8/03/03 | 4,604.17 | |
| | 9/03/03 | 50,000.00 | |
| | 9/03/03 | 4,540.97 | |
| | 10/30/03 | 7,998.60 | |
| | 10/31/03 | 4,197.92 | |
| | 10/31/03 | 3,800.68 | |
| | 11/19/03 | 3,918.05 | |
| | 11/30/03 | 3,918.05 | |
| | 12/19/03 | 3,791.68 | |
| | 2/13/04 | 9,352.77 | |
| | 2/13/04 | 3,918.05 | |
| | 2/13/04 | 5,434.72 | |
| | 2/13/04 | 99,352.77 | |
| | 2/13/04 | 110,000.00 | |

EXHIBIT ___F___
Page __2__ of __2__



BEFORE THE UNITED STATES TRUSTEE

| | | |
|---|---|---|
| In re: | ) | Case No. 04-34670-tmb11 |
| | ) | (Consolidated number) |
| GKPS, Inc. | ) | |
| | ) | |
| SYMPHONY HEALTHCARE IV, | ) | Case No. 04-32592-tmb11 |
| LLC, | ) | |
| | ) | |
| SYMPHONY HEALTHCARE V, | ) | Case No. 04-32593-tmb11 |
| | ) | |
| SYMPHONY HEALTHCARE I, INC., | ) | Case No. 04-34667-tmb11 |
| | ) | |
| SYMPHONY HEALTHCARE II, | ) | |
| INC., | ) | Case No. 04-34668-tmb11 |
| | ) | |
| Debtors. | ) | |
| | ) | 341(a) MEETING OF CREDITORS |

# TRANSCRIPT OF PROCEEDINGS

June 8 and June 22, 2004
U.S. Trustee's Office
Portland, Oregon

**BEFORE**

M. VIVIENNE POPPERL
  Attorney for the U.S. Trustee's Office

**APPEARANCES OF COUNSEL**

TIMOTHY CONWAY and ALBERT KENNEDY
CRAIG GABBERT
  Attorney at Law appearing for the debtor

DANIEL ROSENHOUSE
  Attorney for Oregon Department of Justice

JOE FIELD
  Attorney at Law appearing for Unsecured Creditors Committee



EXHIBIT  G
Page  1  of  5

1                          P R O C E E D I N G S

2                              JUNE 8, 2004

3             MS. POPPERL:  Now is the time for the first

4    meeting of creditors in the five cases which are

5    administratively consolidated under GKPS, Inc., Case No.

6    04-34670-tmb11.

7             My name is Vivienne Popperl.  I'm with the Office

8    of the United States Trustee.  I'll be conducting the

9    meeting.  Present here today we have Mr. Hostmann, and we

10   also have the attorney for the five consolidated debtors,

11   Mr. Conway.

12            What I'd like to do first is swear Mr. Hostmann

13   in, and then I will go ahead and ask some questions

14   regarding the schedules.  And I would like to invite the

15   creditors to ask questions too.  The only thing I would

16   like to have you do, though, is when you have a question,

17   please come up to the table, have a seat over here, and

18   then state your name for the record.  We have a new

19   recording system we're trying to break in.  So that's what

20   that's all about.

21            Ready, gentlemen?  Okay.  Mr. Hostmann, will you

22   please raise your right hand.

23        **EDWARD CHARLES HOSTMANN, Debtor's representative,**

24                           **DULY SWORN:**

25            MS. POPPERL:  Would you please state your full

                                   1

EXHIBIT  G
Page  2  of  5

1          MR. ROSENHOUSE:  Whenever you want to take a

2 break, let me know.

3          MS. POPPERL:  All right.

4          MR. ROSENHOUSE:  I probably (indiscernible).

5          MS. POPPERL:  All right, let me just finish up

6 with (indiscernible).

7 Q    (By Ms. Popperl)  What is Hospital and Surgical Center

8 Management Services?

9 A    It was actually an entity that was originally set up

10 that we were going to use -- Hospital --

11 Q    Hospital and Surgical Center Management Services.

12 A    Hospital and Surgical Center Management Services.

13          MR. HOSTMANN:  Ken, I think that's the Western

14 National Bank payment.  It was made to Western National

15 Bank.

16          MR. GABBERT:  Oh, those were the payments made on

17 the -- on the Western National Bank line?

18          MR. HOSTMANN:  Yeah.

19          MR. PERRY:  Oh, okay.

20 Q    (By Ms. Popperl)  Would you explain that.  I'm not

21 understanding that very well?

22 A    Originally, there was an entity set up called Hospital

23 Surgical Center whatever --

24 Q    Hospital and Surgical Center Management Services.

25 A    Right.  I don't think that's the actual legal name of

1  the entity, but -- and it was set up -- we were actually

2  going to buy the hospitals out of it but did not.  And as

3  part of -- when we purchased these hospitals, the four

4  principals took out a loan for GKPS that, you know, was

5  used as part of the money to buy the facilities.  It was a

6  loan to GKPS.

7          Originally, actually, it was structured to go to

8  this hospital and surgical center, but got redone to GKPS,

9  and then all of us had to guarantee that, just like we did

10 the Healthcare Business Credit, but it was money that was

11 used to purchase the facilities.

12 Q    And so it was approximately -- was it --

13 A    It was -- it started out originally as a million

14 dollars.

15 Q    And was a million dollars actually received?

16 A    Yes, oh, yes.

17 Q    And was all of the money used for GKPS?

18 A    Yes it was.

19 Q    Was all of -- that money could have also been used for

20 Symphony I, II, III, IV and V?

21 A    That's correct.  That's correct.

22 Q    And so the payments, dating back through 2002, through

23 February of 2004, those are repayments of that loan?

24 A    The interest and repayments to that loan.

25 Q    And has that been repaid in full?

## DECLARATION OF TRANSCRIBER

I, Patricia Morgan, of Morgan Verbatim, Inc., hereby certify that:

(A)   I am an Official Transcriber for the State of Oregon, and an Official Transcriber for the United States Court Administrator;

(B)   that I personally transcribed the electronic recording of the proceedings had at the time and place hereinbefore set forth before Vivienne Popperl, in the matter of GKPS, et al, Debtors,

(C)   that the foregoing pages, consisting of pages 1 through 126, represent an accurate and complete transcription of the entire record of the proceedings, as requested, to the best of my belief and ability.

WITNESS my hand at Appleton, Washington this 22nd day of February, 2005.

_____
Patricia Morgan
Official Transcriber

EXHIBIT  G
Page  5  of  5



**WNB**
*Western National Bank*

~ 4181
bonline.com
r FDIC

*508 West Wall Street*
*P.O. Box 61250*
*Midland, Texas 79711*
*Fax 432-617-1348*

*2700 West County Road*
*P.O. Box 4597*
*Odessa, Texas 79760*
*Fax 432-334-5525*

*801 North Texas*
*P.O. Box 4597*
*Odessa, Texas 79760*
*Fax 432-332-4192*

*2710 North Grandview*
*P.O. Box 4597*
*Odessa, Texas 79760*
*Fax 432-368-9259*

*4101 North Midland Drive*
*P.O. Box 61250*
*Midland, Texas 79711*
*Fax 432-520-3350*

*607   Scurry Street*
*767*
*ng, Texas 79720*
*Fax 432-466-0028*

December 15, 2004

Mrs. Bobbie Kale
#6 La Paz Circle
Odessa, Texas 79765

RE:  Hospital and Surgical Center Management Services, LP

Dear Mrs. Kale:

As per your request, below is the breakdown of the payoff on the above referenced loan:

| | |
|---|---|
| Principal & Interest: | $510,883.12 |
| 1% fee due at payoff or maturity: | $ 17,000.00 |
| Legal fees: | $  3,605.54 |
| Payoff: | $531,488.66 |

*1/2 = 265,744.33*

Should you have any questions, please call me at 368-4181.

Sincerely,

*Emilda Mendoza*
Emilda Mendoza
Administrative Officer

*This payoff was evenly split between Roberta Kale and Ken Perry*

`01018`

Exhibit  H
Page _1_ of _1_

# THE BASIN'S BANK

**WNB** **Western National Bank**
P.O. Box 4597 • Odessa, Texas 79760

INDIVIDUAL DEBIT

WE HAVE TODAY DEBITED YOUR ACCOUNT FOR THE AMOUNT AND REASON INDICATED

DATE 4/23/03

Debit for 4/1/03 loan payment on loan #222686
Per Ken Perry's request, per email

APPROVED BY

ACCOUNT NUMBER
GKPS, Inc.
* 224039 49  Symphony Healthcare Woodward

AMOUNT
$ 105,597.22

⑆5512⑈0737⑆                              83

EXHIBIT I
Page 1 of 2

GKPS 0883

**WNB Western National Bank**
P.O. Box 4597 • Odessa, Texas 79760

INDIVIDUAL DEBIT

WE HAVE TODAY DEBITED YOUR ACCOUNT FOR THE AMOUNT AND REASON INDICATED

DATE 4/30/03

APPROVED BY

Debit for 5/1/03 loan payment on loan #222686,
Per Ken Perry's request per e-mail

ACCOUNT NUMBER

GKPS, Inc.
Symphony Healthcare Woodland
210 12th Ave South, Ste #201
Nashville, TN 37203

AMOUNT

✱ 224 03949

$    55416.67

⑈5512⑈0737⑈                    83

EXHIBIT    I
Page 2 of 2

GKPS 0886

TABLE OF CONTENTS

Bank of America – Depository – WPH
#21102-24999 ........................................... 1

Bank of America – Depository – EH
#21104-24998 ........................................... 2

Bank One – GKPS Lockbox
#2010001571583747 .................................. 3

Western Nat'l Bank – WPH Lockbox
#22403922 ................................................. 4

Western National Bank – EH Lockbox
#22403930 ................................................. 5

Western National Bank – WPH MOO
#22403957 ................................................. 6

Western National Bank – EH MOO
#22403655 ................................................. 7

Western National Bank – WPH A/P
#22404040 ................................................. 8

Western National Bank – EH A/P
#22404023 ................................................. 9

WNB – Symphony Concentration
#22403949 ............................................... 10

WNB – Symph A/P & Self Insurance
#22403981 ............................................... 11

Western National Bank – WPH P/R
#22404058 ............................................... 12

Western National Bank – EH P/R
#22404031 ............................................... 13

Western Nat'l Bank – Symphony P/R
#22403990 ............................................... 14

WNB SELF-INSURANCE  # 22404597
B of A – WPMA Depository Credit
#2110425587 ............................................ 15

EXHIBIT J
Page 1 2



**Western National Bank**

| | |
|---|---|
| Primary Account: | 22403949 |
| Account Number: | 22403949 |
| Statement Date: | April 30, 2003 |
| Page Number: | 1 of 1 |

PO Box 4597  . Odessa, Texas  79760
PO Box 61250 . Midland, Texas 79711
(915) 333-4231

GKPS INC
DBA SYMPHONY HEALTHCARE
WOODLAND
210 12TH AVENUE SOUTH STE 209
NASHVILLE TN  37203

## Account Analysis Statement

| Combined accts... | 22403655 | 22403922 | 22403930 |
|---|---|---|---|
| | 22403957 | 22403981 | 22403990 |
| | 22404023 | 22404031 | 22404040 |
| | 22404058 | 22404597 | |

| | |
|---|---:|
| Average ledger balance | 187,191.07 |
| Less average float | 127,480.82 |
| | -------------- |
| Average collected balance | 59,710.25 |

## Services Rendered

| | Volume | Price | Total |
|---|---:|---:|---:|
| Maintenance fee | 12 | | 150.00 |
| Credit fee | 228 | .4000 | 91.20 |
| Debit fee | 1,871 | .2000 | 374.20 |
| Non-Local item fee | 849 | .1100 | 93.39 |
| Local item fee | 45 | .1100 | 4.95 |
| Float overdraft fee | | | 205.44 |
| INCOMING WIRE TRANS | 28 | 10.0000 | 280.00 |
| Internet Banking | | | 49.95 |
| CD Only Statement | 1 | 19.9500 | 19.95 |
| OUTGOING WIRE TRANS | 16 | 20.0000 | 320.00 |
| Lock Box Nonauto itm | 888 | .5000 | 444.00 |
| LOCKBOX MAINTENANCE | 1 | 250.0000 | 250.00 |
| Overnight Courier | | | 2,324.09 |
| | | | ------------- |
| Total calculated charges | | | 4,607.17 |
| Total balance required for services | | | 5,277,943.89 |
| Balance available for other services | | | .00 |

## Recap of Account Analysis

| | |
|---|---:|
| Reserve amount at 10.000% (collected) | 7,970.59 |
| Investable balance (collected) | 71,735.41 |
| Credit for balances at  1.180% | 69.58 |
| Less interest earned | .00 |
| Net credit for balances | 69.58 |
| Less charges for services | 4,607.17 |
| | ------------- |
| Net result of analysis | 4,537.59- |

EXHIBIT   J
Page  2  of  2

David W. Criswell, OSB# 92593
dcriswell@balljanik.com
BALL JANIK LLP
101 SW Main Street, Suite 1100
Portland, OR 97204
Telephone: (503) 228-2525
Facsimile: (503) 226-3910
Of Attorneys for Amy Mitchell,
Chapter 7 Trustee

CLERK US BANKRUPTCY COURT
DISTRICT OF OREGON

'06 JUL 18 P3:53

LODGED_____ REC'D_____
PAID_____DOCKETED._____

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF OREGON

In re

**GKPS, Inc.,**

　　　Debtor.

Case No. 04-34670-tmb**7**

**CERTIFICATE OF SERVICE**

I hereby certify that I served copies of the foregoing:

1.　　**MOTION FOR SUBSTANTIVE CONSOLIDATION UNDER § 105(a) (ORAL ARGUMENT REQUESTED);**

2.　　**MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR SUBSTANTIVE CONSOLIDATION UNDER § 105(a); and**

3.　　**AFFIDAVIT OF MATTHEW A. GOLDBERG IN SUPPORT OF TRUSTEE'S MOTION FOR SUBSTANTIVE CONSOLIDATION UNDER § 105(a)**

on the following parties:

GKPS, Inc.
c/o Edward C Hostmann CEO
POB 454
Lake Oswego, OR 97034
　　　Debtor

Albert N Kennedy
888 SW 5th Ave #1600
Portland, OR 97204
　　　Debtor's Attorney

Craig V Gabbert, Jr
315 Deaderick St #1800
Nashville, TN 37238
　　　Debtor's Attorney

David P Canas
315 Deaderick St#1800
Nashville, TN 37238
　　　Debtor's Attorney

Page 1 - **MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR SUBSTANTIVE CONSOLIDATION UNDER § 105(a)**

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone 503-228-2525

::ODMA\PCDOCS\PORTLAND\531862\1

Timothy J Conway
888 SW 5th Ave #1600
Portland, OR 97204
    Debtor's Attorney

US Trustee, Portland
620 SW Main St Rm 213
Portland, OR 97205

Matthew Goldberg
Preston Gates & Ellis LLP
222 SW Columbia St #1400
Portland, OR 97201
    Attorney for Rodolfo Camacho

Kelley Blaine
Special Assistant United States Attorney
620 SW Main St., Rm. 312
Portland, OR 97205

Laura Walker
Cable Huston Benedict Haagensen & Lloyd LLP
2000 Security Pacific Plaza
1001 SW Fifth Avenue
Portland, OR 97204

Craig P Bronstein
400 N Tustin Ave #120
Santa Ana, CA 92705-3815

Daniel H Rosenhouse
1515 SW 5th #410
Portland, OR 97201

Joseph A Field
610 SW Alder #910
Portland, OR 97205

Amy Mitchell
PO Box 2289
Lake Oswego, OR 97035
    Trustee

Rodolfo Camacho
Law Offices of Rodolfo A Camacho
456 State St Ste 100
Salem, OR 97301
    Trustee of Symphony Healthcare V

Barry Caplan, Esq.
Sussman Shank LLP
1000 SW Broadway, Suite 1400
Portland, OR 97205

Robert Vanden Bos
Vanden Bos & Chapman
319 SW Washington St., Suite 520
Portland, OR 97204

Stephen Werts
Cable Huston Benedict Haagensen & Lloyd LLP
1001 SW Fifth Avenue
Suite 2000
Portland, OR 97204

Douglas R Pahl
1120 NW Couch St 10th Fl
Portland, OR 97209-4128

Barbara Provo
10400 SE Cook Ct #143
Portland, OR 97222-1585

Aventis Pasteur
c/o Lisa Karpf
Credit Services Analyst
Discovery Dr, Bldg MB11
Swiftwater, PA 18370

Page 2 -  **MEMORANDUM OF LAW IN SUPPORT OF TRUSTEE'S MOTION FOR
SUBSTANTIVE CONSOLIDATION UNDER § 105(a)**

BALL JANIK LLP
One Main Place
101 Southwest Main Street, Suite 1100
Portland, Oregon 97204-3219
Telephone 503-228-2525

::ODMA\PCDOCS\PORTLAND\531862\1