David A. Foraker, OSB #81228
E-mail: david.foraker@greenemarkley.com
Sanford R. Landress, OSB #81438
E-mail: sanford.landress@greenemarkley.com
Greene & Markley, P.C.
1515 SW Fifth Avenue, Suite 600
Portland, OR  97201
Telephone:  (503) 295-2668
Facsimile:   (503) 224-8434
        Attorneys for Defendant Western National Bank

UNITED STATES BANKRUPTCY COURT

DISTRICT OF OREGON

| | |
|---|---|
| In re | ) Case No. 04-34670-tmb7 |
| | ) |
| GKPS, Inc. | ) Chapter 7 |
| | ) |
| Debtor. | ) |
| | ) WESTERN NATIONAL BANK'S |
| | ) OPPOSITION TO MOTION FOR |
| | ) SUBSTANTIVE CONSOLIDATION |
| | ) |
| | ) Hearing Date:  September 5, 2006 |
| | ) Hearing Time:  1:30 p.m. |
| | ) Hearing Location:  Courtroom 4 |

Western National Bank ("WNB") submits this opposition to the trustee's motion for substantive consolidation under 11 U.S.C. § 105(a).  WNB also joins in any other opposition to the trustee's motion.

<u>ARGUMENT</u>

The trustee of GKPS, Inc. ("GKPS"), and the trustee of several limited liability companies known as the Symphony Healthcare entities ("Symphony"), seek to consolidate the GKPS estate into the Symphony estate.  The trustees argue at length that the affairs of GKPS and Symphony were "entangled," but provide no concrete proof that GKPS and Symphony acted as a single consolidated entity.  Moreover, the trustees make no attempt to prove that substantive

**Page 1of 5 -**   WESTERN NATIONAL BANK'S OPPOSITION TO MOTION FOR SUBSTANTIVE
        CONSOLIDATION

1   consolidation would benefit the creditors of either estate.  For example, the trustees have made

2   no attempt to prove the likely distribution in either estate absent consolidation, nor have they

3   attempted to prove how the likely distribution would change should the estates be consolidated.

4   The court thus has no idea  whether or not the creditors of either estate will be better or worse off

5   with or without consolidation, unless the court decides to believe the trustees' vague generalities.

6          Even worse, the trustees seek to drag two non-debtor entities into bankruptcy using the

7   procedure of substantive consolidation *nunc pro tunc*.  Those non-debtor entities are Symphony

8   III, Inc. and Hospital and Surgical Center Management Services, LP ("HSC").  Again, the

9   trustees have made no attempt to actually prove that dragging those two non-debtor entities into

10  bankruptcy will benefit the creditors of either of those entities, the creditors of the Symphony

11  estate, or the creditors of the GKPS estate.  The trustees make vague allegations concerning

12  those entities, but provide no real proof that those entities acted as part of a single consolidated

13  entity with GKPS and Symphony.  Moreover, the trustees present no proof of the assets of those

14  non-debtor entities, the claims against those non-debtor entities, or of how consolidation will

15  benefit the creditors of any entity.

16         The truth is that the trustees presently lack sufficient information to determine who will

17  benefit and who will lose as a result of the proposed consolidation.  Moreover, that is really not

18  the trustees' focus.  The trustees' focus, at present, is on obtaining a perceived litigation

19  advantage in two pending adversary proceedings commenced by the trustees against WNB and

20  other defendants (Adversary Proceedings Nos. 06-03215-tmb and 06-03216-tmb).  In those

21  adversary proceedings, the trustees assert multiple claims based primarily on alter-ego and

22  fraudulent conveyance theories as well as preference and fraudulent conveyance claims against

23  WNB.  The trustees' alter-ego and fraudulent conveyance claims involve alleged facts strikingly

24  similar to the alleged grounds for substantive consolidation asserted in the present motion.  That

25  similarity reveals the real purpose of the present motion.  The truth is that the trustees face a jury

26  trial in the adversary proceedings, and they are using the substantive consolidation procedure in

**Page 2of 5 -**   WESTERN NATIONAL BANK'S OPPOSITION TO MOTION FOR SUBSTANTIVE
            CONSOLIDATION

GREENE & MARKLEY, P.C.
Attorneys at Law
1515 S.W. Fifth Avenue, Suite 600
Portland, Oregon 97201
Telephone (503) 295-2668

1   an attempt to avoid litigating the common factual issues in a full jury trial setting after full

2   discovery.  In other words, the trustees are seeking to short-circuit the normal discovery and jury

3   trial process.  In its place, the trustees are seeking to substitute a truncated motion procedure to

4   be tried to the bankruptcy court on short notice without discovery.  That is a misuse of the

5   substantive consolidation procedure.

6          Other courts have encountered bankruptcy trustees attempting to use this same trial and

7   discovery avoidance technique.  The response from those courts has been critical.  The courts

8   have justifiably ruled that trustees, having commenced litigation in the form of adversary

9   proceedings, should see those adversary proceedings through to the end using the normal

10  discovery and trial process.  Such courts have held that trustees should not be allowed to "opt

11  out" of the normal adversary proceeding process, once begun, and achieve their litigation goals

12  through the alternative of substantive consolidation before trial.  *See, e.g., Wells Fargo Bank v.*

13  *Sommers (In re AMCO Insurance)*, 444 F.3d 690, 697 n. 5 (5th Cir. 2006):

14         "it appears on the record before us that other remedies, such
           as the doctrines of alter-ego and fraudulent conveyance, may
15         have been available, and appropriate under the circumstances,
           and the bankruptcy court should duly make such
16         considerations.  Substantive consolidation should not be used
           as a 'free pass' to spare [d]ebtors or any other group from
17         proving challenges, like fraudulent transfer claims, that are
           liberally brandished to scare yet are hard to show.  *Owens*
18         *Corning,* 419 F.3d at 215.  As the *Owens Corning* court
           noted, if the objectors to substantive consolidation were as
19         vulnerable to the fraudulent transfer challenges as alleged,
           'then the game should be played to the finish in that arena.'"

20

21         WNB would also be greatly prejudiced by the proposed consolidation.  WNB has

22  submitted the declaration of Paul W. Lucas in support of this opposition to substantive

23  consolidation.  Mr. Lucas explains that WNB relied on the separate existence of HSC in

24  making the loan at issue in the adversary proceedings.  That entity is not in bankruptcy.

25  Mr. Lucas explains that the loan documents between WNB and HSC in fact expressly

26  forbid HSC to merge or consolidate with any other entity.  Moreover, in the adversary

**Page 3of 5 -**   WESTERN NATIONAL BANK'S OPPOSITION TO MOTION FOR SUBSTANTIVE
                   CONSOLIDATION

GREENE & MARKLEY, P.C.
Attorneys at Law
1515 S.W. Fifth Avenue, Suite 600
Portland, Oregon 97201
Telephone (503) 295-2668

1   proceedings HSC has denied receiving any transfers from Symphony and has asserted the

2   good faith defenses available to remote transferees under 11 U.S.C. § 550(b). If HSC is

3   now dragged into bankruptcy, and consolidated with Symphony, WNB's "good faith"

4   defenses in the adversary proceeding will be adversely affected or disappear entirely.

5   That is an inequitable result, especially given the trustee's present inability to prove a

6   beneficial effect to other creditors. WNB therefore urges the court to either deny the

7   present motion for substantive consolidation, or to combine the present motion with the

8   existing adversary proceedings and defer any ultimate decision until trial. If the court

9   rejects this request, WNB asks the court to at least make sure that its consolidation order

10  preserves all defenses that HSC presently has as if no consolidation had occurred.

11      The trustees rely primarily on the Ninth Circuit's opinion in *Bonham* to support

12  their motion. The trustees' reliance on *Bonham* is misplaced. *Bonham* does not create a

13  rule authorizing substantive consolidation whenever trustees might gain a litigation

14  advantage from consolidation. *Bonham's* holding is much more limited. First, the court

15  must consider the facts in *Bonham*. *Bonham* involved a proven Ponzi scheme, and the

16  need to create fraudulent conveyance and preference actions where no such actions

17  existed absent consolidation. Here, the trustees already have pending fraudulent

18  conveyance and preference claims against WNB and others. They do not need

19  consolidation to create such claims. Also, nothing remotely resembling a Ponzi scheme

20  is involved. In this case, the trustees simply want to make their existing litigation claims

21  easier to prosecute by gaining significant rulings in what they perceive to be a favorable

22  forum, in the context of an expedited motion procedure without discovery. Nothing in

23  *Bonham* justifies using the substantive consolidation procedure to obtain such a result.

24      In fact, the Ninth Circuit in *Bonham* expressly recognized that resolving a

25  substantive consolidation request by means of an adversary proceeding is one of the

26  proper procedural alternatives available to bankruptcy courts. *Bonham*, 229 F.3d at 765

**Page 4of 5 -**   WESTERN NATIONAL BANK'S OPPOSITION TO MOTION FOR SUBSTANTIVE
          CONSOLIDATION

GREENE & MARKLEY, P.C.
Attorneys at Law
1515 S.W. Fifth Avenue, Suite 600
Portland, Oregon 97201
Telephone (503) 295-2668

1   n. 9.  The Ninth Circuit, in *Bonham*, also specifically ruled that once a creditor such as

2   WNB shows that it has relied on the separate credit of one of the entities to be

3   consolidated, and that it will be prejudiced by substantive consolidation, the burden of

4   proof shifts to the trustee.  Once that burden of proof shifts, "the court may order

5   consolidation only if it determines that the demonstrated benefits of consolidation

6   'heavily' outweigh the harm." *Id.* at 766.  The Ninth Circuit, in *Bonham*, also stated that

7   "[r]esort to consolidation . . . should not be Pavlovian . . . but as almost every other court

8   has noted, should be used 'sparingly.'" *Id.* at 767.  Here, the trustees have not

9   demonstrated the benefits of consolidation.  All the trustees have presented is argument,

10  along with minimal evidence of nothing at all unusual in the context of closely-held start-

11  up companies where some of the participants are not businessmen.

12                                    <u>CONCLUSION</u>

13          The court should deny the present motion.  In the alternative, the court should

14  combine the present motion with the pending adversary proceedings and order that any

15  decision on consolidation will be deferred until trial after a full opportunity for discovery.

16  If the court decides to order substantive consolidation now, its order should expressly

17  preserve all of WNB's defenses as if no consolidation had occurred.

18          DATED this 9th day of August, 2006.

19                                    GREENE & MARKLEY, P.C.

20

21                                    By /s/ Sanford R. Landress
                                         Sanford R. Landress, OSB #81438
22                                       Telephone:  (503) 295-2668
                                         Facsimile: (503) 224-8434
23                                       sanford.landress@greenemarkley.com
                                         Attorneys for Defendant
24                                       Western National Bank

25

26

**Page 5of 5 -**   WESTERN NATIONAL BANK'S OPPOSITION TO MOTION FOR SUBSTANTIVE
                    CONSOLIDATION

GREENE & MARKLEY, P.C.
Attorneys at Law
1515 S.W. Fifth Avenue, Suite 600
Portland, Oregon 97201
Telephone (503) 295-2668

1  David A. Foraker, OSB #81228
   E-mail: david.foraker@greenemarkley.com
2  Sanford R. Landress, OSB #81438
   E-mail: sanford.landress@greenemarkley.com
3  Greene & Markley, P.C.
   1515 SW Fifth Avenue, Suite 600
4  Portland, OR  97201
   Telephone:  (503) 295-2668
5  Facsimile:   (503) 224-8434
        Attorneys for Defendant Western National Bank
6

7

8

9                 UNITED STATES BANKRUPTCY COURT

10                      DISTRICT OF OREGON

11  In re                          )  Case No. 04-34670-tmb7
                                   )
12  GKPS, Inc.                     )  Chapter 7
                                   )
13              Debtor.            )
                                   )  DECLARATION OF PAUL W. LUCAS
14                                 )  RE: MOTION FOR SUBSTANTIVE
                                   )  CONSOLIDATION
15

16      I, Paul W. Lucas, being first duly sworn, declare:

17      1.      I am an Executive Vice-President and Credit Officer of Western National Bank

18  ("WNB").  I am competent to testify.  I make the statements in this declaration based on my

19  personal knowledge.

20      2.      I was involved in WNB's decision to loan funds to Hospital and Surgical Center

21  Management Services, LP, a Nevada limited partnership ("HSC").  A copy of a promissory note

22  dated February 1, 2002 showing HSC as the obligor and WNB as the payee is attached as

23  Exhibit "E" to the Affidavit Matthew A. Goldberg already on file in this case.

24      3.      In making this loan, WNB relied on the separate existence of HSC and on the

25  personal guaranties of the four individuals named in the note.  The note itself shows WNB's

26  reliance on HSC's separate existence.  One of the two items identified as collateral for the loan

**Page 1of  2-**   DECLARATION OF PAUL W. LUCAS RE: MOTION FOR SUBSTANTIVE
                    CONSOLIDATION

1   are the ownership interests of each guarantor in HSC.

2       4.      A true and correct copy of a Summary Approval Memorandum dated January 29,

3   2002 is attached as Exhibit 1.  I have removed confidential financial statements of the

4   guarantors, which are attached to the original of this exhibit.  As reflected in the Summary, WNB

5   understood that HSC was a start-up company.  It is therefore true that, in making this loan, WNB

6   placed substantial reliance on the financial strength of the guarantors.  However, nothing in the

7   Summary Approval Memorandum indicates any intention on WNB's part to treat HSC, GKPS,

8   or any of the Symphony entities as a single consolidated borrower.  As explained below, WNB's

9   intent was exactly the opposite.  WNB intended that HSC remain a separate entity and WNB's

10  only borrower.

11      5.      The loan documents reflect WNB's insistence on HSC's separate existence.

12  Attached as Exhibit 2 is a true and correct copy of the Loan Agreement between WNB, HSC,

13  and the guarantors.  On page 5 of that Loan Agreement, at paragraph 1(b) in the Negative

14  Covenants section, is the following:

15      "(b)  Mergers, Etc.  Obligor will not (i) consolidate with or merge
        into any other corporation, (ii) permit any other corporation to
16      merge into Obligor, (iii) dissolve or liquidate, or (iv) without the
        prior written approval of Lender, acquire all or any substantial part
17      of the property or assets or capital stock of any other corporation
        or other Person."

18

19      The quoted language demonstrates WNB's reliance on, and insistence on, HSC's separate

20  existence.  It shows that WNB took care to specifically forbid any merger or consolidation.

21      I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE
    BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS
22  MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR
    PERJURY.

23

        DATED: August 7, 2006.

24

25                          /s/ Paul W. Lucas
                            Paul W. Lucas

26

**Page 2of  2-**   DECLARATION OF PAUL W. LUCAS RE: MOTION FOR SUBSTANTIVE
                CONSOLIDATION

# Summary Approval Memorandum

| To: | WNB Senior Loan Committee |
|---|---|
| Officer: | Paul Lucas, JJ Stanford |
| Analyst: | Chris Thompson |
| Date: | 01/29/2002 |
| Re: | HSC Management Services, LLC |
| File: | HSCSAM2002 |

## Request/General:

HSC Management Services, LLC has requested WNB to provide $1,000,000 in financing. Specifically, the funds will be used to provide an equity injection into HSC. The loan will be priced at WSJP + 2.25% floating and will require monthly payments of interest only with principal and accrued interest due at maturity. A $2,500 commitment fee will be charged upon acceptance of commitment and a 1% fee will be due once the borrower sells the two hospitals mentioned below. The loan will have an initial maturity of 12-months. This loan will be supported by the pledge of 100% of HSC stock. This loan will be further secured by the limited guarantees of Suresh Gadasalli, Sudhir Srivastava, Roberta Kale, and Ken Perry. The guarantees of Roberta Kale and Ken Perry will be secured by the pledge of IASIS stock.

HSC is a new (Nevada) corporation owned in equal shares by the four guarantors, formed to facilitate consulting services to local doctors planning to acquire existing or construct new hospitals. This niche was identified as an area of need for local doctor groups by Dr. Gadasalli, Dr. Srivastava, and Mrs. Kale during the process of forming Alliance Hospital. Ken Perry is an individual known previously to Mrs. Kale, and has considerable health care industry experience, and worked with Mrs. Kale in the founding of IASIS Healthcare.

## Background:

HSC has entered into contracts to purchase the Woodland Park Hospital and the Eastmoreland Hospital in Portland, Oregon. Healthcare Business Credit Corporation has provided HSC with a financing commitment package totaling $7,000M. The financing package consists of a $5,500,000 revolving line of credit and a term loan in the amount of $1,500M. The proceeds from the RLOC and the term loan will be used to effectively purchase the hospitals and to payoff any existing indebtedness secured by the accounts receivable and real estate of the hospitals. The WNB proposed note will provide the initial equity injection into HSC as required by the commitment provided by Healthcare Business Credit.

HSC's intention with the two Portland hospitals is to purchase them, and syndicate ownership to a group of local doctors in Portland, similar to the Alliance Hospital transaction in Odessa. They would anticipate such action within 6-months, although it is noted that it could take the 12-month term to finalize the transaction. Since this information has become public, HSC has received offers to sell these hospitals to other groups. The principals of HSC have indicated their willingness to sell as soon as possible should an acceptable offer be forthcoming.

EXHIBIT ___1___
PAGE. 1 of 6

## Collateral:

As mentioned, the proposed loan will be secured by 100% of the stock from HSC. HSC is collectively owned 25% each by Suresh Gadasalli, Sudhir Srivastava, Roberta Kale, and Ken Perry. In addition, the four above noted individuals will provide unlimited guarantees of $500,000 each for a total guaranty of $2,000M. The guaranties of Roberta Kale and Ken Perry will be further supported by the pledge of IASIS stock. Specifically, Roberta Kale will pledge 34,252 shares of IASIS and Ken Perry will pledge 42,741 shares of IASIS stock. Although IASIS is not a publicly traded company, a recent valuation of IASIS completed by Paine Webber determined that a reasonable market value of the stock would be $15.00 per share. Given this value, the shares pledged by Roberta Kale would have an estimated market value of $513,780 and the shares pledged by Ken Perry would have an estimated market value of $641,115. As evidenced by the Loan Presentation Worksheet, this proposed loan is adequately secured when consideration is given to the cost of the initial equity injection and the estimated market values of the IASIS stock. Further support is provided by the guarantees of Dr. Gadasalli and Dr. Srivastava.

## WNB Legal Lending Limit Implications:

Given the fact that Dr. Gadasalli and Dr. Srivastava currently maintain loan relationships with WNB and further guaranty the Alliance Hospital debt, it is necessary to provide an accurate accounting of the impact of this proposed loan to WNB's Legal Lending Limit with regards to these two doctors. As shown on the Loan Presentation Worksheet, it appears that the combination of Dr. Gadasalli's debt with Dr. Srivastava's debt along with their percentage guaranty of the Alliance Hospital debt, that this loan would cause WNB's Legal Lending Limit to be exceeded. However, as the below analysis indicates, WNB's Legal Lending Limit has not been exceeded. Specifically, given the fact that Dr. Srivastava and Dr. Gadasalli maintain separate relationships and do not guaranty each others respective obligations, it is not necessary to consolidate the two for legal lending purposes. WNB's total exposure is determined as follows:

| Dr. Gadasalli | Commitment / Guaranty | Dr. Srivastava | Commitment / Guaranty |
|---|---|---|---|
| WNB #222489 | 193,798 | WNB #125423 | 100,000 |
| WNB #224884 | 1,295,816 | WNB #125247 | 15,584 |
| WNB #222645 | 150,000 | WNB #219478 | 335,313 |
| Recently Approved | 1,000,000 | Alliance Guaranty | 790,691 |
| Recently Approved | 250,000 | HSC Guaranty | 500,000 |
| Alliance Guaranty | 790,691 | | |
| HSC Guaranty | 500,000 | | |
| Total Exposure | 4,180,305 | Total Exposure | 1,741,588 |

The Gadasalli and Srivastava guaranty of the WNB portion of the Alliance Hospital is determined to be approximately 26.9% of the $3,000M WNB plans to keep, thus the $790,691 value given above. In addition, each doctor will provide a limited guaranty in the amount of $500,000 towards the proposed HSC debt. As such, as indicated above, the proposed HSC loan and the doctors subsequent limited guarantee does not pose a WNB Legal Lending Limit issue.

EXHIBIT  1
PAGE 2 of 6

## Exceptions:

WNB Loan Policy typically requires the submission of at least three years of financial statements on the borrowing entity. Historical financial statements are not available as HSC is newly formed. Departure is mitigated due to the presence of the individuals involved who will provide sufficient guaranties to support the proposed loan. Further, the financial capacity of the guarantors and the presence of additional collateral mitigate this departure.

## Financial Review:

As HSC is a newly formed entity, the analysis presented in this package centers around the guarantors involved. A brief analysis of the guarantors has been presented below. Please refer to the attached spreads for further information regarding Dr. Gadasalli, Dr. Srivastava, Roberta Kale, and Ken Perry.

### Dr. Gadasalli:

Per the attached 9/30/01 GFA, Dr. Gadasalli has a considerable net worth, but limited liquidity of $250M. Business investments consists primarily of $4,500M in Suresh Gadasalli MDPA (valuation based on 50% of annualized collections or 1.1x NBV), $863M in Gadasalli Rental Partnership (based on 9/30/01 NBV), and $559M in Gadasalli family Limited Partnership (based on NBV). Other assets in the amount of $3504M are comprised on Homes and personal property, all of which are debt free. As noted in the attached GFA, Dr. Gadasalli's liquidity has declined from $1,200M to $98M due to increases in personal assets. Related entity Gadasalli Family Limited Partnership does report liquidity of $389M. The Alliance stock is also owned by Gadasalli Family Partnership. Liquidity is expected to return to historical levels as a result of anticipated continued strong earnings.

Dr. Gadasalli's debt consists of $318M in notes payable to related entity Gadasalli Rental Partnership and $25M of accounts payable.

Dr. Gadasalli has provided his 1998, 1999, and 2000 tax returns to WNB for analysis. Dr. Gadasalli has generated average monthly cash flow in excess of debt service of $60M, $158M, and $86M in 1998, 1999, and 2000 respectively. In addition, a consolidated cash flow has been included which includes all Gadasalli related entities. This consolidation includes Dr. Gadasalli, Gadasalli Rental Partnership, and Gadasalli MDPA. For years 1998, 1999, and 2000, total excess monthly cash flows were $228M, $97M, and $277M, respectively. Overall, Dr. Gadasalli maintains sufficient capacity to support the HSC guaranty.

### Dr. Srivastava:

Per the attached 6/30/01 GFA, Dr. Srivastava reports total asssets of $5,344M, total liabilities of $877M, resulting in a net worth of $4,467M. Total liquidity is reported at $204M with $423M in secondary liquidity. Other assets include business investments of $3,039M, personal residence of $1,250M, and other property in the amount of $350M.

Dr. Srivastava's debt consists of a $4332M in secured liabilities and a $443M owed for Federal Income Taxes.

3

Dr. Srivastava has provid( )is 1998, 1999, and 2000 tax return ) WNB for analysis. Dr. Srivastava has generated average monthly cash flow in excess of debt service of $16M, $14M, and $27M in 1998, 1999, and 2000 respectively. In addition, a consolidated cash flow has been included which includes all Srivastava related entities. This consolidation includes Dr. Srivastava and West Texas Cardiac Surgical Associates. For years 1998, 1999, and 2000, total excess monthly cash flows were $18.5M, $24.5M, and $24.9M, respectively. Overall, Dr. Srivastava maintains sufficient capacity to support the HSC guaranty.

## Ken Perry:

Per the attached 12/31/01 GFA, Ken Perry reports total assets of $2,654M, total liabilities of $320M, resulting in a net worth of $2,334M. Primary liquidity is reported at $1,782M; however, this could be considered somewhat restricted liquidity due to the nature of the IASIS stock. Other assets include a personal residence in the amount of $374M, and other property in the amount of $464M.

Ken Perry's debt consists of $247M in secured liabilities and $73M in credit card obligations.

Ken Perry has provided his 1998, 1999, and 2000 tax returns to WNB for analysis. Mr. Perry has generated average monthly cash flow in excess of debt service of $3M, $8M, and $10M in 1998, 1999, and 2000 respectively. Overall, Mr. Perry provides adequate support of his HSC guaranty.

## Roberta Kale:

Per the attached 12/31/01 GFA, Roberta Kale reports total assets of $3,157M, total liabilities of $1,035, resulting in a net worth of $2,122M. Primary liquidity is reported at $374M with $928M in secondary liquidity. Other assets include $1,798M in real estate with the remaining $57M in other personal property.

Mrs. Kale's debt consists of $942M in mortgages, $15M in credit cards, and $78M in other secured debt. Mrs. Kale intends to liquidate real estate in Nashville and Salt Lake City to facilitate her move to Odessa, and received a contract on the Nashville home on 1/29/02.

Mrs. Kale has provided his 1998, 1999, and 2000 tax returns to WNB for analysis. Mrs. Kale has generated average monthly cash flow in excess of debt service of $11M, $10M, and $12M in 1998, 1999, and 2000 respectively. It is noted that Mrs. Kale has accepted the position of Hospital Administrator for Alliance Hospital, a position with an initial salary of $175M annually. Overall, Mrs. Kale provides adequate support of her HSC guaranty.

EXHIBIT 1
PAGE 4 of 6

## HSC Cash Flow Consolidation:

Briefly, two cash flow consolidations were prepared to demonstrate the cash flow of the Gadasalli and Srivastava relationships combined with Mrs. Kale, Mr. Perry, and the proposed debt on two different structures. The first cash flow consolidation assumes the payback of the HSC note as proposed. Under this scenario, for 1998, 1999, and 2000, the cash flow coverages would have been 5.5x, 3.4x, and 4.6x, respectively.

The second consolidation assumed payback of the proposed HSC note on a 24-month amortization. Under this scenario, cash flow coverages for 1998, 1999, and 2000 would have been 3.3x, 2.0x, and 3.2x, respectively.

## Other Relevant Information:

As of the writing of this presentation, WNB has requested but has not yet received, information pertaining to the Paine Webber IASIS stock valuation, financial summaries on IASIS, and previous documentation of IASIS willingness to repurchase Mrs. Kale's stock. This information will be reviewed prior to closing.

In addition, the historical (Last 12-Months) and projected financials for the two subject hospitals has been included with this package.

## Loan Agreement:

This credit facility will be governed by a comprehensive loan agreement with the standard representations and warranties along with the following covenants:

- Borrower shall be required to provide quarterly and year to date company prepared financial statements within 45 days of quarter end, prepared on GAAP standard.
- Borrower shall be required to provide annual audited financial statements within 120 days of year end, prepared on GAAP standard.
- All deposit accounts of purchased hospitals to be maintained with WNB. It is noted that payroll accounts may need to be maintained locally
- The borrower shall assume no new debt in HSC without prior written approval from WNB
- Borrower shall be required to provide all other collateral, financial, and any other information as required by WNB.
- All guarantors will be required to provide annual personal financial statements in conjunction with a list of contingent liabilities within 45 days of year-end.
- All guarantors will be required to provide federal tax returns within 30 days of filing.

EXHIBIT 1
PAGE 5 of 6

}                                          }

## Relationship Profitability:

Please refer to the attached consolidated yield that includes Dr. Srivastava, Dr. Gadasalli, Alliance, and HSC relationships. This yield was prepared primarily for informational purposes only as other WNB products are expected to be utilized by Alliance and HSC in the future.

## Recommendation:

Approval of the proposed HSC loan is recommended based on sufficient guarantor support. As noted in the above analysis, in addition to the HSC stock, WNB will maintain 76,993 shares of IASIS as collateral. In addition, the financial capacity of all guarantors involved further support this transaction.

EXHIBIT  /
PAGE  6 of 6



# LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement"), is made and entered into by and among HOSPITAL AND SURGICAL CENTER MANAGEMENT SERVICES, L.P., a Nevada limited partnership, ("Obligor") acting by and through its general partner, GKPS, Inc., a Delaware corporation, located at 5313 Franklin Road, Nashville, Tennessee 37220, SURESH N. GADASALLI, M.D., ROBERTA A. KALE, KENNETH PERRY and SUDHIR SRIVASTAVA, M.D., herein collectively referred to as "Guarantors" and WESTERN NATIONAL BANK, a national banking association, with offices at 2710 N. Grandview Avenue, Odessa, Texas 79762 ("Lender") on this the 1st day of February, 2002.

### I.    Loan

1.    Subject to the terms and conditions of this Agreement, Lender agrees, to extend credit to Obligor in an amount of ONE MILLION AND 00/100 DOLLARS ($1,000,000.00).

2.    The indebtedness shall be evidenced by a note ("Note") in substantially the form of Exhibit "1" attached hereto and incorporated herein at this point as if set out verbatim.

3.    <u>Interest on and Repayment of The Note</u>. As detailed in the attached Exhibit "1". In addition, Lender agrees to review the interest rate on the Note, at the written request of the Obligor, and to adjust the interest rate as mutually agreeable to Lender and Obligor.

4.    <u>Maturity Date</u>    February 1, 2003

5.    <u>Use of Proceeds</u>.  The proceeds of the Note shall be used by Obligor for the purpose of providing equity into Obligor.

6.    <u>Commitment Fee</u>.   Obligor shall pay to the Lender a Commitment Fee in the amount of $2,500.00 upon acceptance of the commitment and a one percent (1%) fee on the Maturity Date.

### II.    Collateral

1.    <u>Collateral</u>.  To secure full and complete payment and performance of the Obligations, Obligor shall execute and cause to be executed the below described security agreements and security instruments (collectively, the "Security Documents"):

(a)    Security Agreement for pledge of shares and all of her interest in the Obligor by Roberta A. Kale in substantially the form of Exhibit "2" attached hereto and incorporated herein at this point as if set out verbatim.

(b)    Security Agreement for pledge by Suresh N. Gadasalli of all of his interest in the Obligor substantially the form of Exhibit "3" attached hereto and incorporated herein at this point as if set out verbatim.

(c)    Security Agreement for pledge of shares and of all of his interest in the Obligor by Kenneth Perry in substantially the form of Exhibit "4" attached hereto and incorporated herein at this point as if set out verbatim.

(d)    Security Agreement for pledge of all of his interest in the Obligor by Sudhir Srivastava in substantially the form of Exhibit "5" attached hereto and incorporated herein at this point as if set out verbatim.

(e)    Consent to Pledge Personal Assets in substantially the form of Exhibit "6" attached hereto and incorporated herein at this point as if set out verbatim.

EXHIBIT 2
PAGE 1 of 8

(g)    Finar    Statements in substantially the form of        ⌐it "7" attached hereto and incorpoᵣₐₜed herein at this point as if set out verbatiṇ...

(h)    Certified resolution of Hospital and Surgical Center Management Services, L.P. in substantially the form of Exhibit "8" attached hereto and incorporated herein at this point as if set out verbatim

(i)    Receipt of the written consent of each general partner, and of each limited partner of Obligor, to the extent required by the limited partnership agreement of Obligor and/or applicable law, approving the loan transactions

2.    Guarantors.    The Obligations shall be guaranteed by Roberta A. Kale, Suresh N. Gadasalli, M.D., Kenneth Perry and Sudhir Srivastava, M.D., in the amounts set out in Exhibits "9", "10", "11" and "12" attached hereto and incorporated herein for all purposes

3.    Other and further documents.    Obligor and Guarantors shall execute and cause to be executed such further documents as Lender in its sole discretion, deems necessary and desirable to evidence and perfect its liens and security interest in the Collateral.

III.    Conditions to Loans

1.    Conditions Precedent    The obligations of Lender hereunder are subject to the satisfaction of the following conditions precedent:

2.    Representations and Warranties.    The representations and warranties contained in Paragraph V hereof shall be true in all material respects on and as of the date hereof and no event of Default and no condition or event at which, with the giving of notice or the lapse of time or both, would become such an Event of Default shall have occurred and be continuing.

3.    Company Documents.    At or before the Closing Date (unless a later date is specified in this Agreement), Obligor shall have delivered or cause to be delivered to Lender in form and substance reasonably satisfactory to Lender:

(a)    a Certified Resolution of the board of directors of the general partner certified by its secretaries or assistant secretaries, which resolutions shall authorize the execution, delivery, and performance by the appropriate Corporate or Partnership Entity to the terms of this Agreement, the Note and the other Loan Papers; and

(b)    a certificate of good standing for Obligor addressed to Lender that the Corporate and Partnership entities are duly organized, validly existing, in good standing, and qualified to do business in the State of Nevada

4.    Loan Papers. Obligor shall have executed and delivered or have caused to be executed and delivered to Lender the Note, Security Agreements, UCC-1 Financing Statements, Consent to Pledge Personal Assets, Guaranties, and such other documents and instruments and appropriate financing statements as Lender deems necessary or desirable to perfect its security interest in and to the Collateral.

5.    Insurance    Obligor shall have delivered or cause to be delivered to Lender binders for all casualty insurance policies naming Lender as loss payee, as required by Section VI(e) hereof.

IV.    The Closing

The Closing of the transactions contemplated by this Agreement and the delivery of all documents and instruments required hereunder to be delivered at the Closing shall occur on February 1, 2002, or at such later date and time as the parties hereto may mutually agree (the "Closing Date"), at the offices of Lender at 2710 N. Grandview Avenue, Odessa, Texas, or at such other place as the parties hereto may mutually agree.

EXHIBIT    2

PAGE 2 OF 8

LOAN AGREEMENT
WNB/HOSPITAL AND SURGICAL CENTER MANAGEMENT SERVICES, L.P.

Page 2

v.    Representations and Warranties

Representations and Warranties   Obligor represents and warrants to Lender as follows:

1.     Organization and Authority of Hospital and Surgical Center Management Services, L.P.  Obligor is a limited partnership duly organized and in good standing under the laws of the State of Nevada, and has a permit to do business in all States necessary by the nature of its business

2.     Organization and Authority of GKSP, Inc.   GKSP, Inc. is a corporation duly organized and in good standing under the laws of the State of Delaware

3.     Authority of Guarantors.  Each of the Guaranties and this Agreement are valid and binding obligations of each of the Guarantors in accordance with their terms. This Agreement and the Guaranties, do not violate any provisions of any agreement, laws or regulations to which such Guarantor is subject, and the same does not require the consent or approval of any State.

4.     Financial Statements.   The Guarantors have furnished to Lender financial statments which fairly represented their assets, liabilities and financial condition, and there are no material omissions from such balance sheets.

5.     Taxes.   Obligor and Guarantors have filed all federal and state tax returns or reports required of them, and the they know of no pending investigations of the Obligor or Guarantors by any taxing authority, nor of any material pending but unasserted tax liability.

6.     Addresses.  The addresses used for the individuals in paragraph IX 4 of this Agreement are the correct residential addresses for those individuals.

VI.    Positive Covenants

1.     Positive Covenants.  Obligor covenants and agrees that, as long as the Obligations or any part thereof are outstanding, unless the Lender shall otherwise consent in writing:

(a)    Performance of Obligations.  Obligor will duly and punctually pay and perform each of the Obligations, including, without limitation, its obligations under this Agreement and each of the other Loan Papers, as the same may at any time be amended or modified.

(b)    Preservation of Existence and Franchise and Conduct of Business. Obligor will do or cause to be done all things necessary to preserve and keep in full force and effect the company existence rights, leases, patents, franchise agreements, and all other licenses or rights necessary to comply, in all material respects, with all laws, regulations, rules, statutes, or other provisions applicable to the Obligor in the operation of its business in Texas, Oregon, Delaware and Nevada.

(c)    Maintenance of Properties. Obligor will cause all of its properties used or useful in the conduct of its business to be maintained and kept in as good of condition, repair and working order, as exists at Closing, and supplied with all necessary equipment, and cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof and thereto, all as in its reasonable judgment may be necessary so that the business carried on in connection therewith may be properly conducted at all times.

(d)    Payment of Taxes and Other Charges. Except as specifically waived by Lender in writing, Obligor will promptly pay and discharge, or cause to be paid and discharged, all lawful taxes, assessments, and governmental charges or services imposed upon it or upon the property, real, personal, or mixed, belonging to it, or upon any part thereof, before the payment thereof shall become in default, as well as all lawful claims for labor, materials and supplies, which, if unpaid, might

LOAN AGREEMENT
WNB/HOSPITAL AND SURGICAL CENTER MANAGEMENT SERVICES, L.P.

EXHIBIT___2___Page 3
PAGE 3 of 8

becc    lien or charge upon such property, or   any part thereof; provided, however, that the Obligor shall not be required to p~, and discharge, or cause to be paid and discharged, any such tax, assessment, charge, levy or claim so long as the applicability, validity or amount thereof shall be contested in good faith by appropriate proceedings diligently pursued, if appropriate reserves have been provided therefore, in accordance with generally accepted accounting principles

(e)    <u>Insurance</u>. Obligor will (i) keep adequately insured by financially sound and reputable insurers all of its tangible property against loss or damage of the kinds customarily insured against by owners of similar property; and (ii) maintain in full force and effect all necessary worker's compensation insurance, and such other insurance as may be required by law or as may reasonably be required by the Lender.

(f)    <u>Maintenance of Books and Records</u>. Obligor will maintain proper books of record and account in which full, true and correct entries in accordance with generally accepted accounting principles will be made of all dealings and transactions in relation to its business and activities.

(g)    <u>Inspection of Properties, Books and Records</u>. Obligor will permit Lender and its representatives to visit and inspect any of the properties of Obligor, to examine and make notes from the books and accounts of Obligor and confer with the officers of Obligor, all during normal business hours at reasonable times as Lender may request.

(h)    <u>Financial Statements and Other Information</u>. Obligor will furnish or cause to be furnished to Lender:

    (1)    As soon as available, and in any event within 120 days of each year end an audited financial statement on Obligor, prepared in accordance with generally accepted accounting principles for such fiscal year in reasonable detail satisfactory to Lender;

    (2)    As soon as available, and in any event within 45 days of each quarter end, a company prepared financial statement for Obligor prepared in accordance with generally accepted accounting principles for such quarter and year to date in reasonable detail satisfactory to Lender;

    (3)    As soon as available, and in any event, within 30 days of filing a copy of the tax returns of Guarantors and on any related entities as Lender shall request;

    (4)    Within 45 days of year end, annual personal financial statements, along with a list of contingent liabilities of Guarantors;

    (5)    Obligor shall, within 30 days of Lender's request, deliver such additional documents and information concerning Obligor as Lender may reasonably request.

2.    <u>Compliance with Laws</u>.    Obligor will comply in all material respects with the requirements of all city, county, state and federal laws, rules, regulation, ordinances, codes and orders

3.    <u>Maintenance of Deposit Accounts</u>.    Obligor will maintain all deposit accounts (except payroll) with Lender.

VII.    <u>Negative Covenants</u>

EXHIBIT 2
PAGE 4 of 8

1. Negative Cove..ts. Obligor covenants and agrees that, .. long as the Obligations or any part thereof are outstanding, unless the Lender shall otherwise consent in writing:

(a) Liens Obligor will not create, assume, or incur or suffer to be created, assumed or incurred or to exist any Security Interest of any kind on any of the property of any character of the Obligor, whether owned as of the date of this Agreement or hereafter acquired other than the Loans from Healthcare Business Credit Corporation in the amounts of $5,500,000 00 and $1,500,000 00.

(b) Mergers, Etc. Obligor will not (i) consolidate with or merge into any other corporation, (ii) permit any other corporation to merge into Obligor, (iii) dissolve or liquidate, or (iv) without the prior written approval of Lender, acquire all or any substantial part of the property or assets or capital stock of any other corporation or other Person.

(c) Transactions With Affiliates. Obligor will not enter into any transaction with any director, officer, shareholder, employee, subsidiary, parent or Affiliate of Obligor, other than arm's length transactions, employee agreements, or similar arm's length business relationships.

(d) Status Change. Obligor will not change its name or jurisdiction of organization, its state in which it does business or convert to a different entity without notifying Lender in advance and taking action to continue the perfected status of the security interest in the Collateral.

(e) Additional Debt Obligor shall assume no new debt without prior written approval from Lender other than the Loans from Healthcare Business Credit Corporation in the amounts of $5,500,000 00 and $1,500,000 00.

VIII Default

1 Events of Default. Events of Default, for the purposes of this Agreement, are set out in Exhibits "1" through "5," said exhibits being incorporated herein for all purposes as if set out at this point verbatim.

2. Remedies Upon Default Upon the occurrence of an Event of Default, Lender may upon notice, and the failure of Obligor to cure the default within ten days after receipt of notice, declare the Obligations, or any part thereof, to be immediately due and payable without further demand, presentment, notice of dishonor, notice of acceleration or intent to accelerate, or protest, which are hereby expressly waived. Upon the occurrence of any Event of Default, Lender may exercise all rights available to it in law or in equity, under the Loan Papers or otherwise.

3 Additional Remedies. In addition to any other security required or permitted hereunder, Lender is hereby given a lien, security interest, mortgage and/or pledge for the payment of all debts and liabilities of Obligor to Lender upon all monies, securities, or other property of Obligor, now or hereafter held by Lender (including property held in safekeeping, custody or pledge, or any items received for collection or transmission and the process thereof), and Lender shall have at all times the right to withhold payment of the balance of any general deposit account of Obligor with Lender. Upon an Event of Default, Lender may appropriate and apply to the payment of any liabilities of Obligor to Lender, whether or not then due, any security therefore and any monies, general deposit accounts, claims, securities, or other property or proceeds thereof, or may sell, assign, give options to purchase, and deliver the whole or any part thereof in one or more parcels, at public or private sale, at the Lender's office, or at any exchange or brokers' board, or elsewhere, for cash, upon credit, or for future delivery.

IX. Miscellaneous

1. Waiver. Neither this Agreement nor any provisions hereof may be changed, waived, discharged, or terminated orally, but only by instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

2.    Assignment  Obligor may not transfer or assign its rights and obligations hereunder and, subject to such restriction, the provisions hereof shall extend to and be binding upon the parties hereto and their respective heirs, successors and assigns  All covenants and agreements made by or on behalf of any of the parties hereto shall bind and inure to the benefit of and be enforceable by, the successors and assigns of the parties hereto, whether so expressed or not, and, in particular, shall inure to the benefit of, and be enforceable by, the holder or holders of the Notes.

3.    Survival of Representations and Warranties   All representations and warranties contained herein or in any other instrument contemplated hereby shall survive the extension and delivery of this Agreement, and the Note, and no investigation by Lender or any closing shall affect the representations and warranties or the right of the Lender to rely on and enforce them.

4    Notices.  Any and all notices or demands which must or may be given hereunder or under any other instrument contemplated hereby shall be given by delivery in person or by registered or certified mail, return receipt requested, postage prepaid, as follows:

To Lender:          WESTERN NATIONAL BANK
                    P. O. Box 4597
                    Odessa, Texas 79760

To Obligor:         HOSPITAL AND SURGICAL CENTER MANAGEMENT SERVICES, L.P.
                    5313 Franklin Road
                    Nashville, TN 37220

To Guarantors:      Roberta A. Kale              Suresh N. Gadasalli, M.D.
                    235 Chatfield Way            500 East 4th Street
                    Franklin, TN. 37067          Odessa, Texas 79761

                    Kenneth Perry                Sudhir Srivastava
                    5313 Franklin Road           419 West 4th Street, Suite 1000
                    Nashville, TN. 37220         Odessa, Texas 79761


All such communications, notices, or presentations and demands provided for herein shall be deemed to have been delivered when actually delivered in person to the respective parties, or if sent by telecopy or sent by overnight courier in the manner provided herein shall be deemed to have been duly given to the party to whom it is directed upon actual receipt by such party  Any notice which is mailed, shall be conclusively presumed to have been duly given to the party to which it is addressed at the close of business on the third Business Day following the date of mailing, provided that such mailing is by registered or certified mail, return receipt requested, with postage prepaid

5.    Applicable Law.  This Agreement, the Notes and other Loan Papers shall be deemed to have been made and to be performable in Odessa, Ector County, Texas, and shall be governed by and construed in accordance with the laws of the State of Texas and the applicable laws of the United States of America.

6.    Counterparts.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

7.    Severability.  Any Section, clause, Subsection, sentence, paragraph, or provision of this Agreement held by a court of competent jurisdiction to be invalid, illegal, or ineffective shall not impair, invalidate, or nullify the remainder of this Agreement, but the effect thereof shall be confined to the Section, clause, Subsection, sentence, paragraph or provision so held to be invalid, illegal or ineffective

EXHIBIT 2
PAGE 6 of 8

8.    Effect of W      No consent or waiver, express or      ·d, by Lender to or of any breach of or deviation from a, ., covenant, condition or duty of Obligor s. .il be deemed a consent or waiver to or of any other breach of the same or any other covenant, condition or duty.

9.    Right to Grant Participations.  Lender shall have the right to grant participations (which may be evidenced by one or more Certificates of Participation) in the indebtedness to Lender incurred under and pursuant to this Agreement at any time and from time to time to other banking institutions organized under the laws of the United States of American or any State thereof (herein called "Participants").  Except as the context may otherwise require, and subject to the terms of the aforesaid Certificates of Participation, all such participants shall be entitled to the rights and benefits of Lender under this Agreement, as if they were specifically named herein, and this Agreement shall be deemed to constitute a direct obligation of Obligor to the Participants

10.    Controlling Provisions.  Unless specifically provided otherwise herein, the terms, covenants, and provisions of this Agreement shall control over any inconsistent provisions in any other of the Loan Papers.  Without limiting the generality of the foregoing, with respect to any of the Loan Papers or any renewals, modifications, rearrangements or reinstatements thereof, the ability of Lender to declare the Obligations due and payable, the existence of an Event of Default, the existence and scope of any right to cure, grace or other similar provision, and the remedies of Lender upon the occurrence of an Event of Default, shall be governed solely by the terms of this Loan Agreement and not such other Loan Papers

Definition of Terms

"Affiliate" of Obligor shall mean an individual, partnership, corporation, trust, unincorporated organization or other entity directly or indirectly controlling, controlled by, or under common control with, Obligor

"Loan Papers" shall mean this Agreement and all documents executed in connection with or pursuant to or contemplated by this Agreement, whether executed prior to or contemporaneously herewith, or subsequent to the execution hereof, including, without limitation, the Notes and other Security Documents, the Guaranties and all other security agreements, documents, agreements, and other instruments contemplated hereby, executed pursuant hereto, or in connection herewith

"Maximum Rate" shall mean a rate of interest per annum from day to day equal to the maximum rate permitted by applicable law as it exists from day to day during the term of this Agreement, including as to Texas Finance Code § 303 Vernon's 1998 (and as the same may be incorporated in other Texas statutes), but otherwise without limitation, that rate based upon the "indicated rate ceiling."

"Obligations" shall mean all obligations, liabilities, and indebtedness of Obligor to Lender, whether now existing or hereafter arising, including without limitation the obligations, liabilities and indebtedness of Obligor under this Agreement, the Note, and the other Loan Papers, and all interest accruing thereon and all costs and attorneys' fees incurred in the enforcement or collection thereof

"Subsidiary" shall mean, individually, all corporations or other persons, the majority of the voting stock or capital of which is owned either at the date hereof or in the future by Obligor.

IN WITNESS WHEREOF, the parties have hereunto duly executed this Agreement in multiple counterparts, effective as of the date first above written

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK.

EXHIBIT 2
PAGE 7 of 8

**OBLIGOR**

HOSPITAL AND SURGICAL CENTER MANAGEMENT SERVICES, L.P.
A Nevada Limited Partnership

By: GKSP, INC.
Its: General Partner

_____
KENNETH PERRY, President

**LENDER**

WESTERN NATIONAL BANK

_____
PAUL W. LUCAS, Vice-President

**GUARANTORS**

_____
ROBERTA A. KALE

_____
SURESH N. GADASALLI, M.D.

_____
KENNETH PERRY

_____
SUDHIR SRIVASTAVA, M.D.

G:\USERS\Lance\Misc\Loan Agreement for Word

EXHIBIT 2
PAGE 8 of 8

LOAN AGREEMENT
WNB/HOSPITAL AND SURGICAL CENTER MANAGEMENT SERVICES, L.P.

Page 8

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing WESTERN NATIONAL BANK'S OPPOSITION TO MOTION FOR SUBSTANTIVE CONSOLIDATION, and DECLARATION OF PAUL W. LUCAS RE: MOTION FOR SUBSTANTIVE CONSOLIDATION, on:

| | |
|---|---|
| Matthew A. Goldberg, Esq. | J. Stephen Werts, Esq. |
| Preston Gates & Ellis LLP | Cable Huston Benedict Haagensen & Lloyd LLP |
| 222 SW Columbia St., #1400 | 1001 SW 5th Avenue, #200 |
| Portland, OR 97201-6632 | Portland, OR  97204 |
| Facsimile No. (503) 248-9085 | Facsimile No. (503) 224-3176 |
|     Of Attorneys for Rodolfo A. Camacho | |
|     Chapter 7 Trustee | |

Brad T. Summers, Esq.
Ball Janik LLP
101 SW Main St., #1100
Portland, OR 97204
Facsimile No. (503) 295-1058
    Of Attorneys for Amy Mitchell
    Chapter 7 Trustee

Douglas Pahl, Esq.
Perkins Coie LLP
1120 NW Couch Street, 10th Floor
Portland, OR  97209-4128
Facsimile No. (503) 727-2222
    Of Attorneys for Sudhir P. Srivastava
    and Suresh N. Gadasalli

by **faxing** a full, true and correct copy thereof to the parties at the fax numbers shown above, which is the last known fax numbers for the parties' office on the date set forth below.

I further certify that, on the date set forth below, true and correct copies of the foregoing WESTERN NATIONAL BANK'S OPPOSITION TO MOTION FOR SUBSTANTIVE CONSOLIDATION, and DECLARATION OF PAUL W. LUCAS RE: MOTION FOR SUBSTANTIVE CONSOLIDATION, were served by electronic notice

/ / /
/ / /

Page 1 of  2   - CERTIFICATE OF SERVICE

**GREENE & MARKLEY, P.C.**
**Attorneys at Law**
**1515 S.W. Fifth Avenue, Suite 600**
**Portland, Oregon 97201**
**Telephone (503) 295-2668**

1   through the bankruptcy court's ECF system, upon the following:

2   Matthew A. Goldberg, Esq.
3   Preston Gates & Ellis LLP
    222 SW Columbia St., #1400
4   Portland, OR 97201-6632
5   mgoldberg@prestongates.com

6   J. Stephen Werts, Esq.
7   Cable Huston Benedict Haagensen & Lloyd LLP
    1001 SW 5th Avenue, #200
8   Portland, OR  97204
9   swerts@chbh.com

10  U.S. Trustee
    620 SW Main St., Rm 213
11  Portland, OR  97205
12  USTPRegion18.PL.ECF@usdoj.gov

13          DATED this 9th day of August, 2006.

14                                          /s/ Sanford R. Landress
15                                          Sanford R. Landress, OSB #81438
                                            Attorneys for Defendant Western
16                                          National Bank

17
    \6130\P Opposition to Motion for Consolidation (GKPS Main).wpd
18

19

20

21

22

23

24

25

26

Page 2 of  2   - CERTIFICATE OF SERVICE